IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NORMAN UTLEY, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. |
| V. | § | |
| | § | 3:05-CV-0046-K |
| MCI, INC., MCI WORLDCOM | § | |
| COMMUNICATIONS, INC., and MCI | § | |
| NETWORK SERVICES, INC. F/K/A | § | |
| MCI WORLDCOM NETWORK | § | |
| SERVICES, INC., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are the following motions:

(1) Defendants' (collectively "MCI") Motion for Summary Judgment on Claims Brought by Plaintiffs in Global Network Management (Doc. No. 208),

(2) MCI's Motion for Summary Judgment on Claims Brought by Plaintiffs in Global Network Planning and Engineering (Doc. No. 222),

(3) MCI's Motion for Summary Judgment on Claims Brought by Plaintiffs in Service Delivery and Carrier Management (Doc. No. 211),

(4) MCI's Motion for Summary Judgment on Claims Brought by Plaintiffs in Corporate Facilities and Real Estate (Doc. No. 214),

(5) MCI's Motion for Summary Judgment on Claims Brought by Plaintiffs in U.S. Field Operations—North Texas Operations (Doc. No. 219),

(6) MCI's Motion for Summary Judgment on Claims Brought by Plaintiffs in U.S. Field Operations—South/West Texas Operations (Doc. No. 224),

(7) MCI's Objections to Plaintiffs' Summary Judgment Evidence (Doc. Nos. 276, 278, 279, 283, 284, and 288) which the Court will treat as motions to strike Plaintiffs' summary judgment evidence,

(8) Plaintiffs' Motion to Strike Defendants' Objections (Doc. No. 301), and

(9) Defendants' Motion to Strike Plaintiffs' "Corrections" (Doc. No. 305).

By the Court's Order of January 22, 2008, MCI's Motion for Summary Judgment on Claims Brought by Plaintiffs in Service Delivery and Carrier Management (Doc. No. 211) and MCI's Motion for Summary Judgment on Claims Brought by Plaintiffs in U.S. Field Operations—South/West Texas Operations (Doc. No. 224) were **DENIED in part**. The Court **GRANTS** MCI's motions for summary judgment on the remaining claims in these two groups (Doc. Nos. 211 and 224). Additionally, the Court **GRANTS** MCI's motions for summary judgment on all remaining claims in this case (Doc. Nos. 208, 222, 214, and 219). Except where the Court specifies otherwise herein, MCI's motions to strike Plaintiffs' summary judgment evidence are **DENIED as moot.** Plaintiffs' Motion to Strike Defendants' Objections (Doc. No. 301) is **DENIED as moot.** Defendants' Motion to Strike Plaintiffs' "Corrections" (Doc. No. 305) is **DENIED as moot.** After an extensive review of the summary judgment evidence in this case, the Court has determined that summary judgment is appropriate, except where previously denied (*See* Doc. No. 312), because Plaintiffs are unable to raise a genuine issue of material fact on any of their claims.

## I. Factual and Procedural Background

This is an age discrimination case arising out of MCI's decision to terminate Norman Utley, Johney Evans, Larry Boyd, Danny Hunter, Jeffrey Vonschmittou, John Alvarez, Richard Garcia, Gordon Guerra, Walter Gove, Fidel Herrera, Gregory Lyons, Tommy Merrill, Alfred Preissler, Debra McIver, Veronica Monticolombi, Michael Schwarz, Deborah Schimek, Aaron Smith, David Tuttle, and David Valdez (collectively "Plaintiffs") as part of a reduction in force ("RIF"). As a result of its declining financial condition, MCI decided to reduce the costs of its operations between 2001 and 2004. Specifically, MCI reduced its workforce from a high of approximately 75,000 in 2001 to approximately 34,000 at the end of 2004. MCI terminated employees in January, April, and June of 2004 as part of its RIF (respectively "January 2004 RIF," "April 2004 RIF," and "June 2004 RIF"). On January 6, 2005, twenty former MCI employees filed suit against MCI alleging that MCI terminated them as part of the RIF in violation of the Age Discrimination in Employment Act ("ADEA") 29 U.S.C. 621 et seq. Nineteen of the original twenty plaintiffs remain in the case. Plaintiff Evans was dismissed pursuant to Fed. R. Civ. P. 25(a). (*See* Doc. No. 309).

This Court, by its order of June 14, 2006, granted MCI's motion for separate trials and divided Plaintiffs into six groups based on the six different organizations in which they worked. The six groups included: (1) Global Network Management, (2) Global Network Planning and Engineering, (3) Service Delivery and Carrier

Management, (4) Corporate Facilities and Real Estate, (5) U.S. Field Operations—North Texas Operations, and (6) U.S. Field Operations—South/West Texas Operations. MCI filed motions for summary judgment as to each of the six organizations. MCI's Motion for Summary Judgment on Claims Brought by Plaintiffs in Service Delivery and Carrier Management was **DENIED** as to Plaintiffs Herrera and Lyons' age discrimination claims. MCI's Motion for Summary Judgment on Claims Brought by Plaintiffs in U.S. Field Operations—South/West Texas Operations was **DENIED** as to Plaintiff Valdez's retaliation claim. This opinion addresses the remainder of the claims based on the division in which each plaintiff worked.

## II. Summary Judgment

Summary judgment is appropriate when the pleadings, affidavits and other summary judgment evidence show that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All evidence and reasonable inferences must be viewed in the light most favorable to the nonmovant. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

## III. Summary Judgment under the ADEA

The ADEA makes it unlawful "for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C.

623(a)(1). When a plaintiff alleges disparate treatment, liability depends on whether the plaintiff's age, the protected trait under the ADEA, actually motivated the employer's decision. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000), *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 309 (5th Cir. 2004).

The Court uses a three step process to evaluate ADEA claims at the summary judgment stage, the modified McDonnell Douglas approach. *Rachid*, 376 F.3d at 312. First, the plaintiff must establish a prima facie case of discrimination, which creates a presumption that the employer engaged in unlawful discrimination. *Tex. Dept't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). A plaintiff must show four things to make out a prima facie case of age discrimination. The plaintiff must show that (1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class, meaning that he was at least 40 years of age; and (4) he was i.) replaced by someone outside the protected class, ii.) replaced by someone younger, or iii.) otherwise discharged because of his age. *Rachid*, 376 F.3d at 309.

Second, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for discharging the employee. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993). The defendant's burden is one of production, not persuasion, and involves no credibility assessments. *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 385 (5th Cir. 2003).

Finally, the burden shifts back to the plaintiff to offer sufficient evidence to create

a genuine issue of material fact either: (1) that the defendant's reason is not true, but is instead a pretext for unlawful discrimination, or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's age. *Rachid*, 376 F.3d at 312.

Plaintiffs contend that they are each able to establish the elements of a prima facie case. MCI argues that Plaintiffs are unable to establish a prima facie case. For purposes of this opinion, the Court assumes, without deciding, that Plaintiffs are able to establish a prima facie case. Consequently, MCI bears the burden of articulating a legitimate, nondiscriminatory reason for Plaintiffs' terminations.

### A. Reduction in Force Cases

It is undisputed that Plaintiffs were terminated as part of a RIF. A RIF is a presumptively legitimate, nondiscriminatory reason for MCI's decision to terminate Plaintiffs. *Equal Employment Opportunity Comm'n v. Tex. Instruments Inc.*, 100 F. 3d 1173, 1181 (5th Cir. 1996). A plaintiff can rebut the presumption of legitimacy by showing either: (1) the purported RIF is merely a sham and nothing more than pretext for age discrimination, or (2) the RIF, while legitimate on face, is implemented in such a way that age is impermissibly used as a factor in determining which employees are terminated. *See Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004); *Thornbrough v. Columbia and Greenville R.R. Co.*, 760 F.2d 633, 645 (5th Cir. 1985), *abrogated on other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993). Where a plaintiff

challenges the presumptive validity of an RIF, the defendant must articulate a specific nondiscriminatory reason why the plaintiff in particular was included in the RIF. *See Patrick*, 394 F.3d at 317; *Thornbrough*, 760 F.2d at 645 (noting that the concern in a RIF case is "why, given the employer's need to reduce his workforce, he chose to discharge the older rather than the younger employee"). Finally, the burden shifts to the plaintiff to show that the reason proffered by the defendant is merely pretext for age discrimination. *Rachid*, 376 F.3d at 312.

Plaintiffs in this case attempt to show pretext in a variety of ways. Most Plaintiffs argue that they were "clearly better qualified" than other younger similarly situated employees that were not terminated in the RIF, and that MCI's reasons for terminating them have changed over time.

### 1.) "Clearly Better Qualified" Legal Standard

In an RIF age discrimination case, a plaintiff may establish pretext by showing that he was "clearly better qualified" for his position than a younger similarly situated employee that was not included in the RIF. *See Eberle v. Gonzalez*, No. 06-50954, 2007 WL 1455928 (5th Cir. May 18, 2007) (applying "clearly better qualified" standard in a failure to promote age discrimination case). Applying the "clearly better qualified" standard in the context of a RIF makes sense. If the plaintiff was "clearly better qualified" than a younger similarly situated employee, it would be unusual for the employer to include the plaintiff in the RIF instead of the younger employee, unless the

employer improperly used age as a basis for the decision. Evidence that a plaintiff was simply more qualified than the younger employee is not sufficient. *Id. at \*7.* The plaintiff must establish that he was *"clearly better qualified." Id.* This standard requires more than mere speculation. *Id.* The bar is set high for this kind of evidence. *Celestine v. Petroleos de Venezuela SA*, 266 F.3d 343, 347 (5th Cir. 2001). The disparities in qualifications must be of "such weight and significance that no reasonable person, in the exercise of impartial judgment," could have terminated the plaintiff in the RIF. *See Ash v. Tyson*, 546 U.S. 454, 457 (2006) (approving similar language while rejecting the requirement that the disparity in qualifications be so apparent as virtually to "jump off the page and slap you in the face").

## 2.) Changing Reasons

Many Plaintiffs argue that MCI's stated reason for their inclusion in the RIF have changed over time. An employer's evolving explanation for an employee's termination may raise a genuine issue of material fact. *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.,* 482 F.3d 408, 415 (5th Cir. 2007). This analysis, however, is driven by the particular facts relating to each individual plaintiff, and the Court focuses on the substance of the proffered reason rather than the manner in which it is stated.

## B. Age Related Comments and the "Stray Remarks" Doctrine

Many Plaintiffs attempt to support their age discrimination claim by pointing to age related comments made by coworkers and supervisors. In order for comments to be

probative of age discrimination, Plaintiffs must show that the comments were (1) age-related, (2) proximate in time to the termination, (3) made by an individual with authority over the termination, or someone in a position to influence the termination decision, and (4) related to the employment decision. *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 576 - 78 (5th Cir. 2003); *Brown v. CSC Logic, Inc.* 82 F.3d 651, 655 (5th Cir. 1996). In *Reeves v. Sanderson Plumbing Products Inc*, the Supreme Court corrected the Fifth Circuit by holding that a discriminatory remark did not need to be "in the direct context" of the adverse action. 530 U.S. 133 (2000). Fundamentally, the question is whether a remark made by a coworker or supervisor could support an inference that the plaintiff was terminated based on age. Where a plaintiff relies on remarks made by coworkers, the plaintiff must show that the coworker himself or the coworker's comment somehow influenced the decision to terminate the plaintiff. *See Palasota*, 342 F.3d at 576 - 78.

The Court will assume, without deciding, that Plaintiffs have established a prima facie case of age discrimination, the burden then shifts to MCI to articulate a legitimate, nondiscriminatory reason for their terminations. *Hicks,* 509 U.S. at 506-07.

### C. MCI Divisions

MCI filed six motions for summary judgment. The Court addresses each of those motions in the following order: Global Network Management, Global Network Planning and Engineering, Service Delivery and Carrier Management, Corporate Facilities and

Real Estate, U.S. Field Operations—North Texas Operations, and U.S. Field Operations—South/West Texas Operations.

## IV. Global Network Management

David Tuttle and Walter Gove worked for MCI in its Global Network Management division until they were terminated as part of MCI RIFs. Tuttle and Gove argue that they were unlawfully terminated based on their age in violation of the ADEA.

In December 2003 Rick Farren, Director of Global Network Management, learned from his vice-president, Mike Bickel, that MCI was planning a RIF for January 2004. As part of the RIF, Farren was scheduled to lose 10 positions in his division. Farren spoke with the managers in his division, including Glenn Rudolph, to plan for the RIF. Rudolph was the manager of Managed Network Systems where he was in charge of two teams—IP Support and Transport Support. Farren and Rudolph decided that Rudolph would lose three positions in the RIF—two from IP Support and one from Transport Support. Farren asked Rudolph to provide him with rankings of the members of each of his groups to be used in determining who would be included in the RIF. Based on Rudolph's rankings, David Tuttle was included in the RIF.

In addition to Tuttle, Walter Gove was terminated from the Global Network Management group. In May 2004, Parker Webb was asked to prepare stack rankings of his reports by his supervisor, Senior Manager Man Ho Park. Webb identified Gove as the most likely candidate for an RIF. Park and his supervisor, Director Mark Wittry,

accepted Webb's ranking. As a result, Gove was terminated as part of the June 2004 RIF.

## A. David Tuttle

Prior to joining MCI, David Tuttle worked for Electronic Data Systems ("EDS"), a customer of MCI services. There he provided support to EDS's Sync Research Frame-Relay Device ("FRAD") and Racal Datacom networks as part of the Element Management Group ("EMG"). After joining MCI, Tuttle became an employee in the EMG until 2001 when the group was disbanded. Tuttle was primarily responsible for providing technical support to networks operating on a FRADs platform. After the EMG was disbanded, Tuttle was moved to the Transport Support group working under Rudolph. The Transport Support group, in addition to providing support for the FRADs technology, was responsible for providing support to a variety of other technologies. MCI claims that is was Tuttle's failure to learn the other technologies that, in part, led to his inclusion in the January 2004 RIF. Tuttle was 51 years old at the time of his termination.

### 1.) MCI's Nondiscriminatory Reason for Terminating Tuttle

MCI claims that it terminated Tuttle because it no longer had a need for the technical support Tuttle provided, and because Tuttle had not adequately learned to provide technical support in other areas. Throughout his time at MCI, Tuttle had been primarily responsible for providing technical support for a specific technology—FRAD

devices. MCI provided FRADs technical support through a contract with Tuttle's former employer, EDS. In 2003, MCI learned that the only customer for which it provided FRADs support, Credit Union Information Group ("CUIG"), would not be requiring those services beyond September 12, 2004. Rudolph says he believed that FRAD technology was the only technology Tuttle could fully support. Additionally, MCI claims that Tuttle, unlike the other employees in this group, was not well versed in the other technologies supported by Transport Support group. Consequently, MCI concluded that Tuttle was a good candidate for the January 2004 RIF.

### 2.) Tuttle's Evidence of Pretext

Because MCI has articulated a specific nondiscriminatory reason why Tuttle was included in the RIF, the burden shifts back to Tuttle to show that MCI's proferred reason is merely pretext for unlawful age discrimination.

### a.) Tuttle's Evidence that MCI's Reasons for His Termination Have Changed

Tuttle argues that MCI's stated reasons for his termination have changed over time and that the change is evidence of pretext. In MCI's response to the EEOC, it indicated that Rudolph based his ranking on the team's workload, individual performance ratings, and the shifts on which individuals worked. In his deposition, Rudolph confirmed that his decision was based, in part, on employees' shifts. He indicated that he attempted to avoid "backfilling"—a process whereby an employee would have to switch shifts to replace a terminated employee. Tuttle points to the

testimony of Farren, Rudolph's supervisor, as inconsistent with Rudolph's explanation. Farren said that he did not recall issuing any directive that would have prevented backfilling.

Tuttle contends that the alleged conflict in Rudolph and Farren's testimony is evidence that the stated reason for his termination is merely pretext for unlawful discrimination. The Court disagrees. During his deposition, Rudolph indicated that he didn't recall whether the directive against backfilling came from Farren or from human resources. There is no inconsistency in Rudolph and Farren's testimony if the directive against backfilling was issued by human resources. More importantly, Tuttle has offered no evidence that Rudolph's efforts to avoid backfilling worked to the disadvantage of older workers. Such evidence would allow the trier of fact to conclude that Rudolph's stated reason—a policy against backfilling— was merely pretext for age discrimination. Even if Rudolph operated under the incorrect assumption that he needed to avoid backfilling, that alone would be insufficient to raise a genuine issue of material fact in these circumstances. *See Bauer v. Albemarle Corp.*, 169 F.3d 962, 967 (5th Cir. 1999).

### b.) Tuttle's Evidence that MCI's Reasons Are Unworthy of Credence

Next, Tuttle argues that MCI's proffered reason for his termination is simply unworthy of credence. MCI indicated that part of the reason Tuttle was terminated was because his primary area of expertise, FRAD technology, had diminished in importance because MCI thought it had lost the primary customer using that technology. Tuttle

points to the fact that MCI continued to support FRAD technology after his termination as evidence of the falsity of MCI's proffered reason. However, Tuttle does not dispute that MCI received a termination letter from its primary customer receiving support for FRAD technologies shortly before his termination. The relevant inquiry is whether MCI really believed its need for FRAD technical support would decrease at the time of Tuttle's termination. The fact that MCI later continued to provide technical support for FRADs does not show that MCI did not genuinely believe its need for FRAD technical support was on the decline. Even though MCI was mistaken about its future need for FRAD technical support, that, without more, does not demonstrate the falsity of its proffered reason for Tuttle's termination.

### 3.) Tuttle's Direct Evidence of Age Discrimination

Tuttle contends that he can raise a genuine issue of material fact on his age discrimination claim even if he is unable to raise a fact issue by showing the falsity of MCI's proffered reason. Tuttle contends that Rudolph favored younger workers on the Transport Support Team. In his briefing to the Court, Tuttle goes so far as to contend that "Rudolph admits that he favored younger workers on the Transport Support Team." Curiously, Tuttle provides no citation to the record in support of this bold assertion. The Court's review of Rudolph's deposition testimony found no such admission. The only citation to Rudolph's deposition provided by Tuttle in that section of his briefing merely indicates that Rudolph encouraged Brian Springer, a younger employee, to begin

learning IP technology. The fact that Rudolph encouraged an employee younger than Tuttle to learn IP technology is not evidence of discrimination. Tuttle has not pointed the Court to any evidence that Rudolph denied Tuttle similar opportunities, or that Rudolph discriminated against older employees in any other way.

Tuttle has failed to bring forth evidence raising a genuine issue of material fact on his age discrimination claim. Consequently, the Court concludes that summary judgment is appropriate.

### B. Walter Gove

Walter Gove commenced his employment with MCI in 1994. Gove initially worked in MCI's technical training department as an instructor and course designer. In 2002, the technical training department was subject to a RIF which resulted in a 50 percent reduction in employees. Although Gove's position was eliminated, his employment with MCI was not terminated because he was transferred to the Network Security Systems group.

When Gove first joined Network Systems Security, he worked on the data systems security team. In that capacity, Gove was responsible for implementing and maintaining security on internal MCI data systems. Later, Gove was moved to the "SAM team" where he reported to Parker Webb. Webb supervised two teams of technicians—the "SAM team" and the "Sonet team". SAM is a platform which is used to secure remote access to network systems. As a member of the SAM team Gove was

responsible for performing audits and maintenance on the SAM platform. Gove was also responsible for writing procedures for how to access the SAM platform and interface with other platforms. Webb claims that he selected Gove for the June 2004 RIF because he believed Gove possessed the smallest skill set of all of his direct reports and because Gove had not yet mastered his job responsibilities. Gove was 68 when he was terminated.

### 1.) MCI's Nondiscriminatory Reason for Gove's Termination

MCI claims that Gove was terminated because he had the narrowest skill set of all the employees reporting to Webb. Webb testified that once a SAM or Sonet team member was fully trained in his or her responsibilities, Webb encouraged the employee to cross-train with the other team to acquire additional skills. With the exception of Gove, MCI claims all SAM and Sonet team members had done some cross-training across teams. Webb says that Gove had not done any cross-training because he was still in the process of training in his primary area. Webb testified that it was the fact that Gove had the narrowest skill set that led him to believe that Gove could be terminated with the least overall impact on his group.

### 2.) Gove's Evidence of Pretext

Because MCI has articulated a specific nondiscriminatory reason why Gove was included in the RIF, the burden shifts back to Gove to show that MCI's preferred reason is merely pretext for unlawful age discrimination.

### a.)  Gove's Evidence that MCI's Reasons Have Changed

In its statement to the EEOC MCI said that its decision to terminate Gove was based on Webb's rankings.  It indicated that Webb considered "performance, position, and the impact on the business" if his team lost a particular employee.  Gove contends that MCI's explanation for his termination has now changed.  Gove points to the fact that MCI claims that Webb considered whether individuals were able "to perform tasks on more than one team," their "skills sets," and the "criticality" of the employee's expertise.  Gove argues that the evolving explanation is evidence that MCI's preferred reasons for his termination are pretext for discrimination.  The Court finds no inconsistency or meaningful change in MCI's preferred reason.  An individual's ability to perform tasks on multiple teams, skill set, and expertise all directly effect the impact that employee's departure would have on the business.  MCI's explanation is now more detailed, but is not inconsistent.

Gove has failed to bring forth evidence raising a genuine issue of material fact on his age discrimination claim.  Consequently, the Court concludes that summary judgment is appropriate.

### V. Global Network Planning and Engineering

Veronica Monticolombi, Deborah Schimek, Aaron Smith, Gordon Guerra, and Debra McIver worked for MCI as part of its Global Network Planning and Engineering Organization until they were terminated in 2004.  Monticolombi, Schimek, Smith,

Guerra, and McIver argue that they were terminated because of their age in violation of the ADEA.

At the time of the January 2004 RIF, there were approximately 50 employees in the Network Project Management group, a group that appears to be a subdivision of Global Network Planning and Engineering, working under Director John Casper. From approximately June 2002 to January 2004 , the Network Project Management group lost approximately 53 employees as a result of RIFs. In order to plan for the January 2004 RIF, Casper asked the Senior Managers —including Renee Flanagan and Richard Hasz— to provide him a current ranking of the employees reporting to them. As a result of the ranking done by Flanagan, Monticolombi was terminated. As a result of the ranking done by Hasz, Schimek was terminated.

### A. Veronica Monticolombi

Veronica Monticolombi became a full-time employee at MCI in approximately October 2000 working as a Project Manager in the Network Project Management group. At the time of her termination, Monticolombi was assigned to Region I, the Northeast and East Coast region, working under Team Lead Nicole Bergeron. She was responsible for outside plant projects, including the construction of fiber optics and installation. The projects required working with other financial groups who actually performed the work, as well as functional groups that were responsible for obtaining permits in anticipation of construction. During the 18 months leading up to her termination,

Monticolombi was handling new fiber optics bills and installation of new equipment for new customers. She was also responsible for budgets, scheduling work to be completed, compiling project statuses, compiling financial statuses, tracking shipment of equipment, reporting to upper management on project statuses, and conducting weekly calls on all of the projects for which she was responsible. Monticolombi was 40 years old when she was terminated.

### 1.) MCI's Nondiscriminatory Reason for Terminating Monticolombi

MCI claims that the decision to terminate Monticolombi was based on the rankings Flanagan provided to Casper. MCI contends that in ranking her employees, Flanagan considered ability to work on a variety of projects, capabilities, interpersonal skills, written and verbal communication skills, ability to work independently with limited supervision, research ability, and knowledge of relevant financial rules. Monticolombi received an overall rating of "Exceeds" in her 2001 performance review, and an overall rating of "Meets" in her 2002 performance review. According to Flanagan, Monticolombi's performance declined between those two reviews. Flanagan testified that she believed that Monticolombi was not sufficiently focused on her job, and that the lack of focus was reflected in the quality of her work. Specifically, Flanagan believed that Monticolombi was not being as thorough in researching projects with respect to status issues or in resolving the issues quickly. Additionally, Flanagan believed that Monticolombi was not relaying project status information as accurately as she did in the

past.

As an additional reason for Monticolombi's termination, MCI points to an incident of alleged insubordination. MCI claims that Nicole Bergeron, Monticolombi's Team Lead, informed Flanagan of the incident prior to the decision to terminate Monticolombi. Specifically, Bergeron claims that she relayed a request from Flanagan for Monticolombi to schedule a meeting to review the scope of a project and get it outlined. According to Bergeron, Monticolombi responded that she was not going to do it.

Ultimately, Flanagan claims she viewed Monticolombi as the lowest performer in her organization, and ranked her accordingly. MCI also points to the fact that one project manager who was older than Monticolombi was not terminated and one that was younger was terminated.

### 2.) Monticolombi's Proof of Pretext

Because MCI has articulated a specific nondiscriminatory reason why Monticolombi was included in the RIF, the burden shifts back to Monticolombi to show that MCI's proffered reason is merely pretext for unlawful age discrimination.

### a.) Rehire of Younger workers

Monticolombi argues that the rehire of younger workers is proof that MCI's proffered reason for her termination is merely pretext for age discrimination. Specifically, Monticolombi points to the fact Matt Trostel, a younger employee

included in the January 2004 RIF, was rehired less than seven months after the RIF. Monticolombi also points out that eight independent contractors were hired in the two years after the January 2004 RIF as Project Managers. Monticolombi contends that this evidence demonstrates that MCI's proffered reason for her termination is pretext. The Court disagrees. Monticolombi has presented no evidence that younger employees were favored over older employees in the rehire process. Monticolombi appears to argue that MCI terminated both older and younger employees with the intention of rehiring the younger ones. The evidence does not support such a bold assertion. The mere fact that Trostel was rehired does not support an inference that MCI terminated Monticolombi because of her age.

### b.) Monticolombi's Evidence that MCI's Reasons for Her Termination Have Changed

Next Monticolombi argues that MCI's stated reason for her termination has changed over time, and that the evolving explanation is proof that MCI's proffered reason is pretext for age discrimination. Monticolombi says that MCI's statement given to the EEOC is different than the explanation now given to the Court.

Monticolombi claims that MCI's reasons proffered to the EEOC focused on her alleged inability to handle the volume of work. She claims that the reason now proffered by MCI focuses on her alleged lack of focus on her work and general poor performance. Monticolombi also points to the fact that the reason given to the EEOC focused on Casper's impression, while the primary reason stated in its briefing to the Court focuses

on Flanagan's impression. If, as Flanagan claims she believed, Monticolombi was having difficulty focusing on her work, then it would naturally follow that Monticolombi would not perform well on the total volume of her work. Furthermore, there is no material difference in the view of either Casper or Flanagan. Therefore, there is no material change in MCI's stated reason.

Monticolombi has failed to bring forth evidence raising a genuine issue of material fact on her age discrimination claim. Consequently, the Court concludes that summary judgment is appropriate.

### B. Deborah Schimek

Deborah Schimek worked for Telecom USA in 1990 when it was purchased by MCI. After the purchase, Schimek was offered a position with MCI in Richardson, Texas in the Network Project Management group. From approximately April 2003 until her termination in January 2004, Schimek worked under the supervision of Team Lead Richard Hasz. Schimek was 49 years old when she was terminated.

### 1.) MCI's Nondiscriminatory Reason for Terminating Schimek

MCI claims that it terminated Schimek based on Hasz's ranking of the employees working under him. In late 2003, Casper asked Hasz to provide numerical rankings for the employees on his team. Prior to Casper's request, Hasz had prepared spreadsheets for each team member that documented each team member's performance and

accomplishment of responsibilities and objectives in specific areas. Hasz had assigned each team member a score for each category in the spreadsheet. Hasz had then used the spreadsheets to arrive at a score that represented each team member's overall ranking. Schimek was ranked last out of the five employees on Hasz's team. When Casper requested a ranking, Hasz used the scores from the spreadsheets that he had calculated earlier that year in ranking the employees for Casper. Based on the ranking provided by Hasz, Casper decided to include Schimek in the January 2004 RIF.

### 2.) Schimek's Proof of Pretext

Because MCI has articulated a specific nondiscriminatory reason why Schimek was included in the RIF, the burden shifts back to Schimek to show that MCI's proffered reason is merely pretext for unlawful age discrimination. Schimek, who is proceeding pro se in this case, did not file a response to the motion for summary judgment and thus has not met her burden to bring forth evidence sufficient to raise a genuine issue of material fact on her claims. Consequently, the Court concludes that summary judgment is appropriate.

### C. Aaron Smith

Aaron Smith joined MCI in 1999 as a Network Capacity Manager in the DXC Network Services group. His title later changed to Circuit Design Engineer, although his responsibilities remained the same. Robert Mullins supervised Smith from October

2001 through August 2002 and again from January 2003 until his termination in January 2004. Steve Edwards supervised Smith from August 2002 until January 2003 while Mullins participated in a special project. In late 2003, both Smith and his supervisor Mullins were reassigned to the newly created Telco Cost Savings Group—a group created to help implement cost-savings measures for MCI. The Telco Cost Savings Group was later combined with the Access Management and Optimization ("AM&O") group.

In late 2003, Steve Misencik, Director, Data Planning and Capacity Management, was advised of a potential RIF to occur in January 2004. Misencik's superior, Ghavamrezai, provided Misencik with target percentages for the reduction. Misencik communicated the target percentages to his direct reports, including Roger LaChance, Senior Manager, Transmission Mangement. LaChance asked his managers, including Mullins, to prepare rankings for their respective organizations. Mullins ranked Smith last in his organization, which ultimately led to Smith's inclusion in the January 2004 RIF. Smith was 49 years old when he was terminated.

### 1.) MCI's Nondiscriminatory Reason for Terminating Smith

MCI contends that Smith was terminated based on his performance. Specifically, MCI says that Mullins did not base his ranking on performance on the Telco Cost Savings Group as he only had two or three months of performance in that group to

evaluate. Instead, Mullins says he used several different sources to measure performance. For Smith and the other employees who had previously reported to him in the DXC Network Services group, Mullins says he relied on production numbers from their work in that group.

Mullins ranked Smith and Seymore Franklin lowest among the individuals who had previously reported to him in the DXC Network Services group. Both Smith and Franklin had production numbers among the lowest in the group, and both had a project that was overdue in 2003. Mullins claims that he ultimately ranked Smith lower than Franklin because Franklin was familiar with the architecture of MCI's hyperlink system while Smith was not.

The remainder of the employees under Mullins, those that had not previously reported to him in the DXC Network Services group, had only been supervised by Mullins for two to three months. Consequently, Mullins attempted to get the input of the individuals' former managers to assist him in his ranking. Based on the information he gathered and his personal knowledge, Mullins worked the individuals into his ranking around the other employees who had reported to him in DXC Network Services to produce one final ranked list.

Mullins did not receive input from the former managers of four of the individuals he ranked: Laura Chang, Nguyet Nguyen, Mari Garcia, and Noah Sharp Romero. With

respect to Chang, Nguyen, Garcia, and Romero, Mullins claims he based their ranking on the number of "tickets" they worked in their former job. Mullins says that Garcia worked a slightly different job, and thus he based her ranking on her ability to perform the specific objectives of her job.

MCI claims that after LaChance received Mullins rankings, he asked Mullins to lower the ranking of four individuals. Frederico Mederios and Jeff Lytle had their rankings lowered based on LaChance's personal knowledge of their performance. LaChance claims that based on his experience dealing with Mederios and Lytle, he believed they should be ranked lower because he had a relatively low opinion of their performance. Barry Fox and Gary Urie had their rankings lowered to accommodate their request to be included in the RIF. LaChance consolidated Mullins rankings with the rankings provided by Bender, the other manager working under him.

Eleven employees working under Mullins were terminated as part of the January 2004 RIF. Four employees volunteered to be included in the RIF and seven employees—Smith, Lytle, Franklin, Mederios, Nguyet Nguyen, Thieu Nguyen, and Laura Chang—were involuntarily terminated. Although Smith's position was eliminated as part of the January 2004 RIF, he was given an extended termination date. Smith was given the opportunity to work on a special, short-term project called the "Zero Biller" project, a cost-saving effort aimed at taking customers off certain platforms that were outdated. Smith worked on the "Zero Biller" project through July 2, 2004, when his

employment with MCI was terminated.

## 2.)  Smith's Proof of Pretext

Because MCI has articulated a specific nondiscriminatory reason why Smith was included in the RIF, the burden shifts back to Smith to show that MCI's proffered reason is merely pretext for unlawful age discrimination.

### a.)  Subjectivity of Rankings

Smith claims that Mullins ranking was entirely subjective and that this is evidence that MCI's proffered reason for his ranking is merely pretext for unlawful age discrimination.  Smith points out that Mullins used "different and incongruent measures" for the employees that he ranked.  Smith complains that LaChance "compounded the flaws in Mullins' subjective stack ranking by randomly consolidating Mullins' stack ranking with the rankings from the rest of the organization."  Smith's position is unavailing.  Smith's position is nothing more than a critique of MCI's method of determining which employees would be included in the RIF.  The ADEA does not prohibit employers from making subjective decisions about their employees.  Nor does the ADEA mandate that employers always make wise decisions in determining which employees to terminate.  The ADEA merely prohibits an employer from discriminating against employees over the age of 40 on the basis of their age.  Even if LaChance's compilations of the rankings was completely "random," as Smith contends,

that would not violate the ADEA because a random ranking is exactly that—random—and by definition is not based on age or any other factor. Regardless, the evidence does not support an inference that the method used by MCI, as imperfect as it may have been, was actually a veil for age discrimination.

### b.) Production Numbers

Smith attempts to show pretext by arguing that his productions numbers—part of MCI's stated reason for his low ranking—were higher than the production numbers for Paul Hwang and Quan Le, two younger employees that were ranked higher than Smith. Smith contends that there were five "categories of measurable production" and that overall his numbers were better than Hwang and Le's numbers. MCI responds by pointing to Mullins' deposition testimony where he indicated that he based his ranking on "the production numbers, as far as how many—what their average is on the M13 recovery, how many DS3s they had recovered." MCI contends that both Hwang and Le surpassed Smith in the production numbers utilized by Mullins. Smith is not entitled to cherry pick some production numbers and claim that his overall production numbers were better. The mere fact that Smith's production numbers exceeded some other employees in some areas is not sufficient to create a fact issue as to pretext.

### c.) Retention of Lower Ranking Younger Workers

Smith argues that MCI retained workers younger than Smith even though they were lower on Mullins ranking. Specifically, Smith points to Gonzalo Lorenzo, Federico Medeiros, Thieu Nguyen, and Marc Roberts as younger employees that were retained even though they were ranked lower than Smith. MCI responds by pointing to the fact that Medeiros, Nguyen, and Roberts were included in the January 2004 RIF, but continued their employment with MCI, like Smith, on the "Zero Biller" project. With respect to Lorenzo, MCI argues that he was transferred to another group and retained because of his experience in high bandwidth provisions specifically his experience in designing "DS3 circuits". With respect to Medeiros, Nguyen, and Roberts it can hardly be said that they received preferential treatment when they were given the exact same opportunity to continue their employment at MCI as Smith. With respect to Lorenzo, it is undisputed that his area of expertise was different than Smith's area of expertise, and thus, the fact that he was ultimately retained to perform a different job is not evidence of pretext.

### d.) Overdue Project

Smith claims that MCI's allegation that he had an overdue project is merely pretext for age discrimination. Smith contends the real reason the project was overdue was because it had been neglected before Smith was reassigned to it and because the

field technician group did not follow Smith's instructions. MCI responds by arguing that responsibility for the project being late ultimately belonged to Smith. Specifically, MCI's points to Mullins' testimony where he indicated that he believed Smith failed to put the necessary time and effort in to the project until he realized it was going to be late. Smith has not brought forth sufficient evidence to allow the trier of fact to determine that the overdue project was not part of MCI's decision to terminate him. Even if MCI erred in blaming Smith for the overdue project, that alone does not show that MCI relied on improper motives in terminating Smith. Consequently, Smith has failed to carry his burden of raising a genuine issue of material fact.

### 3.) Direct Evidence of Age Discrimination

Smith argues that age related comments made in the work place are direct evidence that he was unlawfully terminated based on his age. Smith's primary complaint is of being called "old man" by co-workers. Smith has not provided any evidence linking the comments of his co-workers to MCI's decision to terminate him. There is no evidence that the coworkers had any influence over the decision to terminate Smith or that the comment influenced the individuals that made the decision to terminate Smith. Consequently the Court concludes that the comments were stray remarks not probative of age discrimination by MCI.

Smith also argues that references to his military pension are evidence that he was

unlawfully discriminated against based on his age. Smith claims that at a meeting with Mullins after his termination, Mullins commented that he "was okay with letting [Smith] go" in the RIF because Smith had his military retirement pension to fall back on. Smith argues that a reasonable juror could infer from Mullins' comment that he considered Smith's retirement and Smith's age in making the decision to terminate Smith. The Court disagrees. Mullins alleged comment may indicate that Mullins considered Smith's alternate sources of income—the military pension—in deciding whether to include him in the RIF. Regardless of whether it is a wise policy, the ADEA does not prohibit an employer from considering whether an employee has alternate sources of income when deciding whether to terminate that employee. Smith has not brought forth any evidence that Mullins treated similarly situated younger employees differently. For example, evidence that Mullins ignored alternate sources of income for younger employees but penalized older workers who had pensions would provide substantial evidence of age discrimination. No such evidence has been offered in this case.

Smith has failed to bring forth evidence raising a genuine issue of material fact on his age discrimination claim. Consequently, the Court concludes that summary judgment is appropriate.

### D. Gordon Guerra

Gordon Guerra began his employment with MCI in July of 1989. At the time of the January 2004 RIF, Guerra was a Team Lead in the Internal Network Services ("INS") group reporting to Charles Merriam. INS was responsible for MCI's communication systems, including voice, data, local, and long distance, and its physical and logical aspects such as circuit provisioning, 800 numbers, and routing. As a Team Lead in INS Guerra was responsible for working on circuits that provided local telephone service to MCI customers and managing the completion of orders by engineers reporting to him. In December 2003, Merriam was informed that MCI was planning for a potential RIF. At the time, Merriam was advised that he should anticipate submitting 10 to 15 names for termination. Merriam submitted Guerra's name, and consequently, Guerra was included in the January 2004 RIF. Guerra was 42 years old when he was terminated as part of the January 2004 RIF.

### 1.) MCI's Nondiscriminatory Reason for Terminating Guerra

MCI claims that it terminated Guerra because it decided to eliminate one of the two Team Lead positions under Merriam, and that Cynthia Jefferson, the other Team Lead, was more essential to the continued operation of the company than Guerra. Prior to 2001, Merriam had only one Team Lead position in his group. That position was filled by Guerra. In 2001,Merriam created a second Team Lead position because of the

growing responsibilities of his group. Jefferson, who had previously worked under Guerra, filled the new position. After 2001, MCI experienced a series of RIFs that reduced the number of employees working in Merriam's group. Consequently, the number of employees working under each Team Lead decreased and Merriam decided to eliminate one of the two Team Lead positions.

MCI claims that Merriam's decision to include Guerra in the RIF instead of Jefferson was not based on age. MCI argues that Jefferson was more essential to the continued operation of the company because not only was she familiar with her current job responsibilities, but also Guerra's job responsibilities, because she had previously worked directly under him. MCI also contends that Guerra was the more expendable employee because he "required more direction and follow-up" than Jefferson.

### 2.) Guerra's Evidence of Pretext

Because MCI has articulated a specific nondiscriminatory reason why Guerra was included in the RIF, the burden shifts back to Guerra to show that MCI's proffered reason is merely pretext for unlawful age discrimination.

### a.) Performance Evaluation

Guerra points to his performance evaluation as evidence of pretext. His evaluation signed six days before his termination stated:

> [Guerra] did not need to be prompted to complete or stay on top of his day to day tasks or project goals. Escalations for lack of action from his area of business were unheard of this year, because he knows what needs to be done and when.

Guerra argues that this positive evaluation shows that MCI's proffered reason for his termination is merely pretext for age discrimination. The Court disagrees. It is undisputed that MCI decided to terminate either Guerra or Jefferson. Given this context, the fact that Guerra received a positive evaluation is not probative of pretext. MCI made a business decision to keep Jefferson and eliminate Guerra. Absent evidence that Guerra was "clearly better qualified" than Jefferson, the Court will not second-guess that decision.

### b.) Guerra's Evidence that MCI's Reasons for His Termination Have Changed

Next, Guerra argues that MCI's proffered reasons for terminating him have changed over time. Guerra argues that MCI originally indicated that he was ranked against all employees working under Merriam, not just Jefferson, the other Team Lead. In its brief to this Court, MCI indicates that Guerra was ultimately compared to Jefferson and terminated because Jefferson was the more essential employee.

MCI responds by arguing that the alleged change in its explanation was no change at all. MCI says that while Merriam did rank Guerra against all of the other employees working under him, the ultimate decision to terminate Guerra was based on a comparison between Guerra and Jefferson. A review of Merriam's deposition testimony

supports MCI's position.  Merriam was asked if he ranked all of the employees reporting to him and he answered in the affirmative.  Merriam said nothing that contradicts the explanation now proffered by MCI.

### c.)  Guerra's Evidence He Was "Clearly Better Qualified"

Next, Guerra argues that he was "clearly better qualified" than Jefferson.  Guerra points to his educational background, knowledge of circuitry, and years of experience as evidence in support of this proposition.  Merriam's explanation for retaining Jefferson instead of Guerra, however, focused on Merriam's belief that Jefferson was better versed in Guerra's duties than vice versa.  Guerra has not provided legally sufficient evidence to the contrary.  Viewing the summary judgment evidence in the light most favorable to Guerra, it could support an inference that Guerra was more qualified than Jefferson in some areas.  The evidence fails, however, to support an inference that Guerra was "clearly better qualified" than Jefferson for the specific position that MCI chose to retain.  Guerra has pointed the Court to no authority for the proposition that the mere fact that he previously supervised Jefferson is sufficient to demonstrate that he is "clearly better qualified" than Jefferson.

Guerra has failed to bring forth evidence raising a genuine issue of material fact on his age discrimination claim.  Consequently, the Court concludes that summary judgment is appropriate.

### E.  Debra McIver

Debra McIver worked for MCI as an Executive Administrative Assistant III in the Product Program Management group.  Prior to 2003, McIver was primarily responsible for providing administrative support to Shelly Karber, Program Manager.  When the Product Program Management group moved to a new building in 2003, McIver assumed responsibility for supporting a variety of different individuals.  At the time of her termination, McIver was primarily providing administrative support to Thomas Brand, Director, and secondarily providing support to Karber and the rest of the group.  In that capacity, McIver performed a variety of responsibilities, including taking care of Brand's calendars, scheduling his meetings and travel, taking care of his expense reports, helping organize invoicing, filing budget reports, and preparing minutes when she was in meetings.  McIver also ordered supplies, kept track of supplies, and answered telephones. Brand learned of the looming RIF in December 2003 while attending a staff meeting. After consulting with Karber, Brand decided to include McIver in the January 2004 RIF. McIver was 52 years old when she was terminated.

### 1.)  MCI's Nondiscriminatory Reason for Terminating McIver

MCI claims that it terminated McIver because Brand and Karber believed she was the least essential employee in the group.  Brand indicated that although he valued her administrative support, he believed the tasks she performed were the kind that could be

absorbed by other employees.  Karber indicated that McIver was a logical choice for inclusion in the RIF because her other reports were each responsible for large dollar revenue-producing products or large cost-saving projects that were critical to the group's strategic plan.

### 2.)  McIver's Evidence of Pretext

Because MCI has articulated a specific nondiscriminatory reason why McIver was included in the RIF, the burden shifts back to McIver to show that MCI's proffered reason is merely pretext for unlawful age discrimination.

McIver argues that MCI's proffered reason for her termination is false.  In her brief to the Court, McIver claims that her work "was vital to the organization and necessary to its substantive goals," and that her loss "had a critically negative effect on the organization."

McIver has not raised a genuine issue of material fact.  As an initial matter, McIver fails to point the Court to any summary judgment evidence whatsoever.  McIver makes claims that are unsupported by affidavit, deposition transcript or any other summary judgement evidence.  For example, McIver claims that Brand acknowledged that her loss had a "critically negative effect" on the organization, but cites no evidence to support this claim.  Even if McIver had supported her claims with summary judgment evidence, her claims would likely fail nonetheless.  Regardless of what effect McIver's

termination had on the organization, there is no evidence that Brand's proffered reason for terminating McIver is false.

## VI. Corporate Facilities and Real Estate

Alfred Preissler worked for MCI as part of the Corporate Facilities and Real Estate division. Preissler argues that he was terminated because of his age in violation of the ADEA.

MCI began planning for the June 2004 RIF in Corporate Facilities and Real Estate in May 2004. At the time of the June 2004 RIF, Michael Swengros was the Director of Technical Facilities Planning at MCI. Swengros was responsible for the planning and management of all technical space, capital expense, budgeting, environmental health and safety, and management of customer collocation product. Swengros was in charge of MCI's Central Office Engineering ("COE") organization. COE was divided into three divisions—COE West, COE East, and COE Central. Each region had both a planning side and an implementation side. When Swengros learned of the potential RIF he started planning for a reduction in his division. Swengros contacted the Senior Managers that worked under him, including Al Maggart, the Senior Manager for COE West. Swengros asked Maggart to evaluate and rank his employees to help determine who would be included in the June 2004 RIF. According to Maggart's ranking list, it was his opinion that Sparlin should be included in the RIF first, then Preissler, then

Parker. Ultimately, Swengros decided to include all of the COE West engineers, except Maggart, in the RIF. MCI claims that Swengros made this decision before he was ever made aware of Maggart's rankings.

## A. Alfred Preissler

Preissler started working for MCI in 1994 as a technical instructor. In approximately 1999 he was promoted to a position as a central office engineer in MCI's COE group. In 2000, Preissler was promoted to Senior Engineer in COE. Preissler remained in that position until his termination from MCI on June 4, 2004. As an employee in the COE group, Preissler was responsible for providing space, power, and planning services for MCI's central offices, including working with real estate on determining the feasibility of maintaining or eliminating facilities. Each engineer in the group was responsible for a different geographic area. At the time of his termination, Preissler was responsible for California, Nevada, Oregon, Guam, and Hawaii. MCI acknowledges that Preissler was a very good employee. Maggart was even of the opinion that Preissler had the ability to learn and adapt quickly. Alfred Preissler was 61 when he was terminated as part of the June 2004 RIF.

### 1.) MCI's Nondiscriminatory Reason for Terminating Preissler

MCI claims that Preissler was terminated because of a decision to eliminate the COE West group. Swengros says he decided he would focus on the COE group for

employee reduction because it was a planning roup, and, at the time, business was not in a growth phase. Consequently, Swengros says he determined that there would not be a great need for future planning. MCI claims that Swengros decided to eliminate the entire COE West group and reclassify Maggart from a manager to an individual contributor, whereby Maggart would be responsible for the planning aspects for the entire one-third of the western United States. Swengros testified that he decided to eliminate the entire COE West group because that group had a light work load compared to other planning groups. He testified that he believed that Maggart could handle the entire region given the knowledge of the area he acquired as a manager. Swengros says he believed that such a consolidation was not possible in any other planning group because the other groups had heavier work loads. Consequently, MCI terminated Preissler, Parker, and Sparlin as part of the RIF.

### 2.) Preissler's Evidence of Pretext

Because MCI has articulated a specific nondiscriminatory reason why Preissler was included in the RIF, the burden shifts back to Preissler to show that MCI's proffered reason is merely pretext for unlawful age discrimination.

### a.) Preissler's Evidence He Was "Clearly Better Qualified"

Preissler attempts to demonstrate pretext by arguing that he was "clearly better qualified" than other employees that were not terminated as part of the RIF. In support

of his assertion, Preissler points to the fact that his tenure was longer than that of several younger employees that were not terminated in the RIF. Specifically, Preissler argues that he was "clearly better qualified" than four younger retained employees. While Preissler admits that none of these employees were in COE West, he argues that they should have been terminated, and he should have been transferred. Swengros testified that he believed it would take at least nine to twelve months for an engineer "to get up to speed" after transferring to a new geographic area. Consequently, Swengros decided not to reshuffle employees in the RIF. Even assuming that Preissler was more qualified than the younger employees in different regions, he has failed to raise a genuine issue of material fact. He has not brought forth any evidence than MCI treated younger employees favorably by allowing them to be transferred to avoid termination. Neither has he brought forth any evidence that Preissler targeted CEO West for the RIF because of the age of the employees. Consequently, Preissler's argument that he was "clearly better qualified" fails.

### b.) COE West Reconstitutes

Preissler argues that COE West reconstituted without him shortly after the RIF, and that this shows that MCI's proffered reason for his termination is pretext for unlawful age discrimination. Specifically, Preissler points to the fact that several planning engineers, including the previously terminated Sparlin, were hired in late 2004 and early 2005. MCI responds by arguing that unexpected business growth necessitated

the hiring of additional planning engineers in COE West several months after the RIF. Preissler admits that he did not apply for a position when MCI began hiring again in late 2004. Instead, he argues that MCI's decision to hire new planning engineers is evidence that he was terminated based on his age. It would be rather strange for MCI to terminate its entire COE West division just to eliminate Preissler because of his age, wait several months, and then hire other engineers to do the same job — knowing all along that this was the plan. The Court does not rule out the possibility of such an extravagant conspiracy to discriminate against an employee. But, in this case, Preissler has not made a legally sufficient showing to allow a reasonable juror to reach that conclusion.

### c.)  Swengros' Knowledge of Preissler

Preissler argues that Swengros did not know enough about his qualifications and abilities to decide whether or not he should be included in the RIF. The Court need not consider whether Preissler is correct in this regard. Even assuming that Preissler is correct, his position shows nothing more than that Swengros may have made an uneducated decision. *See Deines v. Texas Dept. of Protective and Reg. Servs.*, 164 F.3d 277, 281 (5th Cir. 1999) ("whether the employer's decision was the correct one, or the fair one, or the best one" is not a question for the jury). It is not evidence of pretext as it does nothing to prove the falsity of MCI's proffered reason.

### 3.) Preissler's Other Evidence of Age Discrimination

In addition to his attempt to raise a genuine issue of material fact by demonstrating the pretextual nature of MCI's proffered reason, Preissler also points to what he characterizes as "age bias" as evidence of age discrimination. Preissler complains of being called "old man" by coworkers, of the use of the phrase "over the hill," and the occasional use of black balloons at birthday parties. Preissler analogizes these activities to the use of racist comments around the office, and argues that they demonstrate age discrimination.

As an initial matter, the Court is not persuaded by Preissler's analogy to racist language. It is certainly true that just as discriminating against an employee on the basis of race is prohibited by Title VII, discriminating against an employee on the basis of age is prohibited by the ADEA. There is a material difference, though, between an employer tolerating racist comments and an employer tolerating age related comments. A supervisor's failure to respond to an employee calling a coworker a racist epithet may very well raise a fact issue as to whether the employer racially discriminated against the person to whom the racist comment was directed when that person is subsequently terminated. An employer's failure to respond when one employee tells a coworker that he is "over the hill" does not, by itself, support an inference that the employer discriminated against the employee based on age when the older employee is later terminated. In the case at bar, there is no evidence that Preissler ever complained that

he was offended by the remarks, or that MCI was otherwise influenced by the remarks in its decision to terminate Preissler.  Consequently, the Court concludes that the comments are stray remarks not probative of age discrimination.

### VII.  U.S. Field Operations–-North Texas Operations

Norman Utley, Larry Boyd, Danny Hunter, and Jeffrey Vonschmittou  worked for MCI as part of its U.S. Field Operations—North Texas Operations until they were terminated in 2004.  Utley, Boyd, Hunter, and Vonschmittou argue that they were terminated because of their age in violation of the ADEA.

MCI began planning for the April 2004 RIF for the North Texas Operations in March, 2004.  Thomas McCambridge, Vice President, U.S. Field Operations, contacted U.S. Field Operations Directors Harrison Mayfield and Robert LeCour and informed them that they would need to submit a list of names for the April 2004 RIF.

Mayfield contacted his Senior Managers, including Joseph Campos to request that they each provide a list of names of individuals to be included in the April 2004 RIF. Campos, in turn, contacted his subordinates, including Martin Schmidt to request that they provide a list of names of individuals to be included in the April 2004 RIF. Schmidt submitted Larry Boyd's name to Campos, leading to Boyd's inclusion in the April 2004 RIF.

MCI began planning for the June 2004 RIF for the North Texas Operations in late

April and early May, 2004. McCambridge contacted U.S. Field Operations Director James Dean and informed him that he would need to submit a list of names for the June 2004 RIF. McCambridge informed Dean that he would need to reduce the overall headcount in his organization by 17 percent, or roughly 67 employees.

Dean contacted his Senior Managers, including James Egert, to request that they each provide a list of names of individuals to be included in the June 2004 RIF. Egert in turn, contacted his subordinates, including Eric Phillips, Jeff Duke, and Dwayne Page to request that they provide a list of names of individuals to be included in the June 2004 RIF. Phillips submitted Utley's name; Duke submitted Hunter's name; and Page submitted Vonschmittou's name. As a result, Utley, Hunter, and Vonschmittou were terminated as part of the June 2004 RIF.

### A. Norman Utley

Utley began working for ClayDesta Communications, an MCI predecessor, as an Operations Maintenance Supervisor in April of 1985. By 1995, Utley was working for MCI in Fort Worth, Texas as a transmission technician under the job title Telecom Technician IV. Utley was transferred from MCI's Fort Worth location to its Waco location in 2002 or 2003 under the job title Telecom Technician III. At the Waco location, Utley was responsible for maintaining several fiber optics regenerator sites and performing fiber locates for a specified area. Also working at the Waco MCI location

with Utley was his co-worker Frank Walker.  Immediately prior to Utley's termination, both he and Walker were managed by Eric Phillips.  Phillips, who worked from MCI's Grauwyler facility in Irving, Texas, was responsible for managing a team that maintained a 4000 square mile segment of fiber network which encompassed most of Northeast Texas.  Utley was terminated as part of the June 2004 RIF.  He was 61 years old at the time of his termination.

### 1.) MCI's Nondiscriminatory Reason for Terminating Utley

MCI contends that Utley was terminated because he was the only dispensable employee in Phillips' group.  In March 2004, Phillips provided his supervisor, James Egert, with a ranking of the employees on his team, per Egert's directions.  Utley was ranked seventh out of ten employees on Phillips' team.  Egert used these rankings, in part, to decide who would be terminated as part of the June 2004 RIF.  Egert had been directed by his supervisor, James Dean, to make reductions in "secondary markets," as opposed to larger markets, as part of the RIF.  Egert had only two secondary markets within his territory—Longview and Waco—both of which were covered by Phillips' team.  After reviewing overtime reports, manager reports, and consulting Phillips, Egert says he concluded that it was not possible to eliminate an employee from the Longview location.  As a result, Egert says he decided that one of Phillips' team members at the Waco location—Utley or Walker—would be terminated.

Egert and Phillips say they decided that Utley would be terminated as part of the June 2004 RIF because they believed Walker was the more important employee in Waco. Egert and Phillips claim they believed Walker was more essential to MCI because of his expertise, certifications, and experience with the local customer base. Walker was ranked fifth out of ten employees on Phillips' team, two spots above Utley. Moreover, Egert and Phillips thought Walker was better qualified to perform all of the necessary job functions of the Waco site, some of which required special security clearances to work at military sites that Utley did not have. Utley was 61 years old when he was terminated. Walker was 52 at the time.

### 2.) Utley's Evidence of Pretext

Because MCI has articulated a specific nondiscriminatory reason why Utley was included in the RIF, the burden shifts back to Utley to show that MCI's preferred reason is merely pretext for unlawful age discrimination

### a.) Utley's Evidence He Was "Clearly Better Qualified"

Utley argues that he was "clearly better qualified" for the position in Waco than Walker, and therefore, MCI's decision to terminate him instead of Walker is evidence of age discrimination. Utley's only "evidence" to support his assertion, however, is his personal opinion that he was better qualified than Walker and younger employees at other sites. Utley's mere subjective belief that he was "clearly better qualified" than his

fellow employees is not sufficient to raise a fact issue as to whether he was discriminated against based on his age. *See Eberle v. Gonzalez*, No. 06-50954, 2007 WL 1455928 at *7 (5th Cir. May 18, 2007); *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996). Utley has not provided any comparative evidence that would allow the trier of fact to conclude that he was "clearly better qualified" than Walker or other employees. He has not provided evidence of superior work performance reviews, the opinions of other MCI employees that he was "clearly better qualified," or objective evidence of superior qualifications and skills.

### b.) Utley's Evidence that MCI's Reasons for His Termination Are Unworthy of Credence

Next, Utley argues that the fact that two younger employees ranked below him, Steven Hanna and Jeremy Shackelford, were not terminated is evidence of age discrimination. Utley's argument is without merit. MCI's preferred reason for Utley's termination is that MCI decided to terminate an employee in the Waco office. Neither Hanna nor Shackelford worked in the Waco office. Utley's observation that MCI terminated him, an employee in the Waco office, rather than either of the two employees not in the Waco office is entirely consistent with MCI's position.

Utley attempts to deal with this problem by arguing that MCI's decision to terminate an employee from Waco instead of Longview is merely pretext for age discrimination. In order to raise a genuine issue of material fact, Utley would need to

bring forth evidence demonstrating the falsity of MCI's claim that it decided to eliminate an employee from Waco for business reasons. Utley, however, has failed to bring forth sufficient evidence. He merely points out that the Waco location was responsible for a "big geographical area" and had two fewer employees than the Longview location. Without more specific evidence, Utley is unable to create a fact issue on this point.

Utley goes on to argue that MCI could have transferred him to a Dallas/Fort Worth location and terminated either Hanna or Shackelford instead. Utley, however, has provided no evidence that such maneuvering of employees was MCI's usual practice. Utley has failed to point to any evidence that MCI went to such extreme measures to avoid terminating younger employees. The ADEA prohibits discrimination against certain individuals because of their age, it does not, however, mandate special treatment for those individuals. MCI's decision to terminate Utley instead of transferring him and terminating another employee is a business decision that this Court will not second-guess, and in no way evidences age discrimination.

### c.) Utley's Evidence that MCI's Reasons for His Termination Have Changed

Next, Utley argues that MCI's proffered reasons for terminating him have changed over time. Utley states that at the time he was terminated, Phillips told him that the decision was made "much higher up" and that Phillips could not tell Utley why

he was being terminated. Phillips alleged comments are not inconsistent with MCI's proffered reason for Utley's termination. The decision to terminate Utley was, at least partially, made by Egert, someone "higher up." Moreover, the authority for that termination came from McCambridge, an MCI Vice President, who could fairly be considered "much higher up" than Phillips.

### B.  Larry Boyd

Larry Boyd was hired by MCI in 1998 as an Operations Technician. Initially, Boyd's duties included working with installations, configurations, maintenance and a variety of other operations. Later Boyd became the manager of the Regional Engineering and Implementations Department. In 2003, Boyd was demoted from his manager position to a technician position as a Senior Implementation Engineer. The reason for Boyd's demotion is unclear from the summary judgment record and is not at issue in this case. Scott Granger and John Holcomb, MCI managers, supervised Boyd in his technician position in 2003. Granger and Holcomb left MCI in January 2004, and Boyd began reporting to Martin Schmidt. Under Schmidt, Boyd's duties consisted primarily of performing remote site surveys and remote engineering at Dallas facilities. Boyd was terminated as part of the April 2004 RIF.

### 1.) MCI's Nondiscriminatory Reason for Terminating Boyd

MCI claims that it terminated Boyd because he was the lowest ranked employee under Schmidt.  Schmidt compiled his rankings based, in part, on information from Holcomb and Granger.  In January 2004, Holcomb spoke with Schmidt to provide him with information about the employees Schmidt would be supervising.  With respect to Boyd, Holcomb told Schmidt that he was technically competent, but that he would sometimes get off track, had to be pushed a little bit, and that he lacked initiative.  Holcomb also mentioned that Boyd often exhibited a negative attitude about MCI, which he believed was the result of Boyd's demotion from a manager position.  In his written notes to Schmidt, Holcomb indicated that if he had to eliminate a job position in the Dallas area, Boyd would be his first choice.  Boyd was also ranked last by Granger in his ranking of plant engineers who became direct reports of Schmidt.  Based on the information from Holcomb and Granger, Schmidt concluded that Boyd offered the least to MCI in terms of workload, skills, and overall value to the organization.  Consequently, Schmidt suggested that Boyd be included in the April 2004 RIF.  Boyd was 49 when he was terminated as part of the April 2004 RIF.

MCI points out that a younger employee that reported to Schmidt, Shawn Farmer was also terminated as part of the April 2004 RIF.  Farmer was 33 at the time of his termination.  Furthermore, MCI points out that of the individuals reporting to Campos who were retained in the April 2004 RIF, at least four were Boyd's age or older.

## 2.) Boyd's Evidence of Pretext

Because MCI has articulated a specific nondiscriminatory reason why Boyd was included in the RIF, the burden shifts to Boyd to show that MCI's preferred reason is merely pretext for unlawful age discrimination.

### a.) Boyd's Evidence He Was "Clearly Better Qualified"

Boyd argues that he was "clearly better qualified" for the position in Schmidt's group than the other younger technicians that were not terminated, and therefore, MCI's decision to terminate him instead of a younger employee is evidence of age discrimination. Boyd points to Holcomb's notes to Schmidt where Holcomb evaluated the abilities of the other employees that worked with Boyd. He points to comments made by Holcomb that some employees were still learning the process. He also points to comments made by Holcomb that another employee was "sometimes lazy." Boyd counters that, unlike his fellow employees, he "was not still learning" and "had thorough knowledge of inside plant work and outside plant work." What Boyd fails to mention, however, is that Holcomb's comments about Boyd were just as critical as his comments about the other employees in Schmidt's group, if not more so. In fact, one of the specific criticisms Holcomb levied upon Boyd was that he was "a little lazy." Nothing in Holcomb's notes, which ironically served in part as the basis for the decision to terminate Boyd, establish that Boyd was "clearly better qualified" for his position than

the other employees working under Schmidt. Furthermore, Boyd's mere subjective belief that he was "clearly better qualified" than his fellow employees is not sufficient to raise a fact issue as to whether he was discriminated against based on his age. *Eberle,* 2007 WL 1455928 at *7; *Nichols*, 81 F.3d at 4. Boyd has not provided any comparative evidence that would allow the trier of fact to conclude that he was "clearly better qualified" than the other employees in Schmidt's group. He has not provided evidence of substantially superior work performance reviews, the opinions of other MCI employees that he was "clearly better qualified", or objective evidence of superior qualifications and skills.

### b.) Boyd's Evidence that MCI's Reasons for His Termination Are Unworthy of Credence

Boyd contends that Schmidt did not have adequate knowledge of his employees skills and capabilities when he ranked them. Boyd points out that Schmidt had managed the employees for less than two months when he did the ranking that was used as the basis for Boyd's termination. Boyd argues that Schmidt's lack of knowledge demonstrates age discrimination. The Court disagrees. It is undisputed that Schmidt relied on information he received from Holcomb and Granger, individuals that did have substantial knowledge about this particular group of employees. Moreover, even if Schmidt made his decision with inadequate information, that fact alone does not demonstrate that MCI's proffered reason is false.

Boyd also argues that inconsistencies exist in Schmidt's deposition testimony that demonstrate that his purported reason for his ranking is pretext for age discrimination. Boyd claims that Schmidt initially indicated that he relied solely on Holcomb and Granger's assessment of the employees in his group and did not do his own ranking. Boyd contends that Schmidt later changed his testimony to indicate that he did his own ranking after a new employee, John Kougl, came on board. A review of Schmidt's deposition transcript shows that Boyd's position lacks merit. During his deposition Schmidt indicated that he primarily relied on the information provided by Holcomb and Granger when ranking his employees. Later, when asked how he evaluated Kougl, a new employee, Schmidt said he had to do his own evaluation of Kougl because Kougl had not worked under Holcomb and Granger. Schmidt's testimony is not inconsistent and does not support Boyd's claim of age discrimination.

### c.) Boyd's Evidence that MCI's Reasons for His Termination Have Changed

Boyd argues that MCI's reasons for his termination have changed, and that the change is evidence of pretext. MCI's position statement to the EEOC did not state a reason for Boyd's termination. Boyd argues that the fact that MCI now articulates a reason for Boyd's termination, when it did not do so at the time of the EEOC's review, shows that MCI discriminated against him on the basis of age. The Court disagrees. When there is a material change in the stated reason for an employee's termination, an inference of discrimination may follow. *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.,*

482 F.3d 408, 415 (5th Cir. 2007). Here, however, MCI did not provide a reason for Boyd's termination at the time of its position statement to the EEOC. The explanation that is now provided by MCI cannot possibly be inconsistent with an earlier explanation, because no such earlier explanation exists. To be sure, there are some circumstances in which an employer's inability to state a nondiscriminatory reason for an employee's termination will give rise to an inference of discrimination. This case, however, is not one. Thousands of employees were terminated as part of the RIFs. It is understandable that MCI would not be able to provide a detailed account, and in some cases would not be able to provide a reason at all, for the termination of every single employee at the time of the review by the EEOC, but would be able to find that reason after sufficient time to conduct its own investigation.

## C.  Danny Hunter

Danny Hunter began his employment with an MCI predecessor, AEROTEK/MFS, in approximately 1995. Initially, Hunter worked as a field technician under the direction of supervisor Gary Grilo. In September of 2003, Hunter was transferred to the Data Net Center located in Richardson, Texas under the direction of supervisor Jeff Duke. MCI had originally planned to include Hunter in a September 2003 RIF, but at Grilo's suggestion, Hunter was transferred to Duke's group in lieu of termination. Under Grilo, Hunter had worked "in the field" on MCI owned equipment. In the Data Net Center, under Duke, Hunter worked primarily "inside" on customer-owned equipment.

At the time of his termination in the Data Net Center Hunter was classified as a Telecom Technician III.  Hunter was 52 at the time of his termination.

### 1.) MCI's Nondiscriminatory Reason for Terminating Hunter

Prior to the June 2004 RIF, Duke prepared a ranking of the employees working below him.  According to MCI, Duke considered information in Resource Manager, a computer program that provides information about each employee's dispatches and orders, as well as each employee's on-time performance record.  Duke also considered each employee's time in service with MCI, time in Duke's department, skill set, training, and motivation.  Hunter was ranked ninth out of eleven.  Duke provided the ranking to his supervisor, Jim Egert in March of 2004.  According to MCI, Egert considered Duke's ranking, Hunter's employee review, and Hunter's work activities in his new position as part of his decision to include Hunter in the RIF.  Although Hunter was not ranked last in Duke's group, MCI claims Egert made the decision to terminate him based on the technical talents of the employees under Duke and the business needs of MCI.  Specifically, Egert claims that he decided to terminate Hunter instead of Rey Reyna, who was ranked lower than Hunter, because Reyna was a switch trained technician and Hunter was not.  Egert claims that he decided to terminate Hunter instead of Victor Peluso, who was also ranked lower than Hunter, because Peluso was on active military duty at the time of the June 2004 RIF.

MCI also points out that of the three individuals that were terminated from Duke's group in connection with the June 2004 RIF, Hunter was the only one that was over the age of 40. Paul Hart and Steve Aleman, the other two employees in Duke's group that were terminated were age 33 and 37 respectively. Additionally, MCI points to the fact that at least ten individuals under Egert that were not terminated in connection with the June 2004 RIF were Hunter's age or older. Specifically, Glynn Dickinson, the oldest employee under Duke was not terminated. Dickinson was in his mid-fifties at the time of the RIF.

### 2.) Hunter's Evidence of Pretext

Because MCI has articulated a specific nondiscriminatory reason why Hunter was included in the June 2004 RIF, the burden shifts back to Hunter to show that MCI's proferred reason is merely pretext for unlawful age discrimination.

### a.) Hunter's Evidence He Was "Clearly Better Qualified"

Hunter argues that he was "clearly better qualified" for his position in Duke's group than the other technicians that were not terminated, and therefore, MCI's decision to terminate him instead of a younger employee is evidence of age discrimination. Specifically, Hunter argues that he was "clearly better qualified" than Reyna or Glen Sellers, switch technicians in Duke's group. Hunter contends that while Reyna and Sellers were only qualified to perform "switch duties," Hunter had a

substantially broader base of skills.  Additionally, Hunter contends that he had more telecommunications knowledge and experience than Shawn Graham, Greg Jost, Scott Cook, and Steven Powers, other technicians in Duke's group.  Like Utley and Boyd, Hunter's evidence that he was "clearly better qualified" is not sufficient to raise a genuine issue of material fact.  Hunter points to his own affidavit, Duke's deposition, and Grilo's deposition as evidence that he was "clearly better qualified."  In his affidavit, Duke states his subjective belief that he was more qualified than other employees. Hunter's mere subjective belief that he was "clearly better qualified" than his fellow employees is not sufficient to raise a fact issue as to whether he was discriminated against based on his age.  *Eberle,* 2007 WL 1455928 at *7; *Nichols*, 81 F.3d at 41. Hunter also points to Duke's deposition where Duke indicated that Hunter was referred to as a "go to guy" on some technical questions and Grilo's deposition where Grilo indicated that Hunter was considered a local network expert.  Importantly, however, Hunter has offered no comparative evidence sufficient to establish that the other employees under Duke did not have similarly important areas of expertise in their own right.  Merely citing an employee's strengths without providing comparative evidence is not sufficient to raise a fact issue.

### b.) Hunter's Evidence that MCI's Reasons Are Unworthy of Credence

Hunter argues that the fact that he was terminated instead of two younger employees ranked below him is evidence of age discrimination.  MCI argues that the two

employees ranked below Hunter were retained for specific reasons. Specifically, MCI says that Ray Reyna was retained because of his skills as a switch technician and that Victor Peluso was retained because he was on active duty military leave at the time of the June 2004 RIF. Hunter argues that MCI's stated reasons are merely pretext for unlawful discrimination. Hunter contends that because he was also trained as a switch technician, the lower ranked Reyna should have been terminated in his stead. Furthermore, Hunter contends that Peluso was not in fact on active military leave at the time of the June 2004 RIF, but had returned shortly before the RIF. Hunter contends that this fact establishes that MCI's stated reason is merely pretext.

The Court disagrees with Hunter's argument. Reyna was one year younger than Hunter at the time of the June 2004 RIF. The notion that MCI discriminated against the 52 year old Hunter in favor of the 51 year old Reyna on the basis of age is more than a stretch. It is irrelevant whether Peluso was on active military duty at the time of the June 2004 RIF. MCI indicated that Peluso was not terminated, in spite of the fact that he was the lowest ranked employee, out of a concern that it would be unfair given his absence from MCI to serve in the military. Whether Peluso returned to MCI shortly before or shortly after the June 2004 RIF makes no difference. Hunter has not brought forth any evidence that would create a genuine issue of material fact based on the MCI's decision to terminate him instead of the two younger employees ranked below him.

Next, Hunter argues that his inclusion in the June 2004 RIF was pretext for

unlawful age discrimination because there was in fact no RIF in his area.  Hunter points to the fact that after his termination three new employees joined Duke's group.  Hunter, however, offers no evidence regarding the job responsibilities of the new employees or any evidence that would indicate that any of the new employees replaced him. Consequently, Hunter has not brought forth sufficient evidence to show that there was no RIF in his area.

### c.) Hunter's Evidence that MCI's Reasons for His Termination Have Changed

Hunter argues that MCI's reasons for his termination have changed, and that the change is evidence of pretext.  In an October 4, 2004 letter to the EEOC, MCI stated that Hunter's termination was "largely influenced by rankings prepared by management."  In a December 3, 2007 letter to the EEOC MCI indicated that Hunter was terminated in part because "he had recently transferred into the Richardson center, and thus, possessed a limited skill set for that environment as reflected in his ranking." Hunter argues that MCI's failure to mention the transfer to the Richardson location in the first letter makes the two letters inconsistent.  The Court disagrees.  The second letter simply added additional detail to the reason articulated in the first letter.  The first letter indicated that Hunter was terminated based on rankings.  The second letter simply adds the additional detail that the transfer to the Richardson location was the likely reason for his low ranking.  The Court finds no inconsistency in the letters, and Hunter is thus unable to raise a genuine issue of material fact.

### D. Jeffrey VonSchmittou

Jeffrey Vonschmittou began working for MCI in April of 1984 as a technician. Vonschmittou worked on voice and data circuits, long distance switches, line conditioning equipment, fiber transmissions equipment, and a variety of other devices. At the time of the June 2004 RIF, Vonschmittou was listed as a Telecom Technician III and was reporting to Dwayne Page. At that time, Page's team was responsible for maintaining and installing circuits and equipment at approximately twenty-five sites in downtown Dallas, Texas. Specifically, Vonschmittou's duties included maintaining and installing circuits and equipment within the downtown Dallas area. Vonschmittou was terminated as part of the June 2004 RIF. He was 48 at the time of his termination.

### 1.) MCI's Nondiscriminatory Reason for Terminating Vonschmittou

In March 2004, Page submitted a quarterly ranking of his employees to Egert. Page ranked Vonschmittou last. Based on the ranking, Egert decided to terminate Vonschmittou as part of the June 2004 RIF. MCI claims that Page ranked the employees based on performance and ability. Specifically, MCI claims that Page considered the employees willingness to participate in a cross-training program that Page implemented when he was relocated to the Dallas location in 1999. As part of this program, each technician would train the other technicians on their primary area of expertise. MCI argues that it was primarily Vonschmittou's reluctance to participate in

the cross-training program that led to his low ranking and ultimately his termination. Additionally, MCI contends that Vonschmittou repeatedly struggled with the administrative tasks associated with his job and that this factored in to his low ranking.

## 2.) Vonschmittou's Evidence of Pretext

Because MCI has articulated a specific nondiscriminatory reason why Vonschmittou was included in the June 2004 RIF, the burden shifts back to VonSchmittou to show that MCI's proferred reason is merely pretext for unlawful age discrimination.

### a.) Vonschmittou's Evidence He Was "Clearly Better Qualified"

Vonschmittou argues that he was "clearly better qualified" for his position in Page's group than the other technicians that were not terminated, and therefore, MCI's decision to terminate him instead of a younger employee is evidence of age discrimination. Vonschmittou points to the fact that he trained many of his fellow employees when they were new hires as evidence that he was "clearly better qualified." Furthermore, he points to his deposition where he claims that he had more experience and more education that the younger employees that were not terminated. The mere fact that Vonschmittou trained some of the employees that were not terminated, standing alone, is not enough to show that he was "clearly better qualified" than the younger employees that were not terminated. One of MCI's stated reasons for

terminating Vonschmittou was his reluctance to participate in the cross-training program and his alleged difficulties with administrative tasks. The fact that Vonschmittou trained some of the employees that were not terminated is not inconsistent in any way with MCI's proffered nondiscriminatory reason for his termination. Consequently, Vonschmittou has not brought forth sufficient evidence establishing that he was "clearly better qualified."

### b.) Vonschmittou's Evidence that MCI's Reasons for his Termination Are Unworthy of Credence

Next Vonschmittou claims that MCI's reasons for his termination are simply unworthy of credence. Specifically, Vonschmittou points to what he claims to be similar problems that other, younger, employees had that did not result in their termination. In his brief, Vonschmittou claims "[t]he stated reason for selecting Vonschmittou is false because none of the technicians reporting to Page were as knowledgeable on the new technologies as he wanted them to be." Vonschmittou cites a three page excerpt of Page's deposition where Page simply states that "the introduction of new responsibilities" necessitated that the cross-training program continue over time. Page's testimony does not support Vonschmittou's claim that MCI's stated reason is pretextual. The fact that Page continued to use a cross-training program to enhance and diversify employees' skills does not demonstrate that MCI's stated reason for Vonschmittou's termination, namely his unwillingness to participate in the cross-training program, is pretext for unlawful age discrimination.

### c.) MCI's Reasons for Vonschmittou's Termination Have Changed

Next Vonschmittou argues that MCI's reasons for his termination have changed, and that this change is proof that its stated reasons are merely pretext for age discrimination. MCI originally indicated that Page's ranking of Vonschmittou, which led to his termination, was based on Vonschmittou wanting to focus solely on certain assignments in his building, his reluctance to do other work, and the fact that his skills were not as diverse as the skills of other employees. Vonschmittou points to the reasons stated by MCI in its brief to this Court as inconsistent. In its brief, MCI states that "Vonschmittou's placement in the rankings was primarily due to the fact that Vonschmittou was not as knowledgeable about all of the downtown sites as the other technicians, and the fact that Vonschmittou repeatedly struggled with the administrative tasks." The Court sees no inconsistency in these two statements, both relate to MCI's perception that Vonschmittou was reluctant to engage in cross-training. Consequently, Vonschmittou has failed to provide any evidence that MCI's stated reasons for his termination have changed.

### E. Plaintiffs' Collective Arguments

Plaintiffs make several arguments collectively that they claim show that MCI conducted its RIF in a discriminatory manner. First, Plaintiffs argue that MCI transferred younger employees to new divisions so they would not have to be included

in the RIF.  Additionally, Plaintiffs argue that age related jokes and statements show that MCI conducted its RIF in a discriminatory manner.

## 1.) Transfer of Younger Employees

Plaintiffs argue that MCI favored younger employees by allowing them to transfer to new departments rather than be terminated as part of an RIF.  Plaintiffs point to instances where younger employees transferred out of groups that were subsequently impacted by MCI's RIF.  However, Plaintiffs have adduced no evidence that the transfers were in any way designed to prevent the younger employees from being included in the RIF.  Moreover, Plaintiffs have provided no evidence that any of the transferred employees were similarly situated with any of the Plaintiffs.

## 2.) Age related Jokes and Statements

Plaintiffs points to a comment made by one of MCI's Senior Managers, James Egert, during his deposition as proof that the RIF was conducted in a discriminatory manner.  In his deposition, Egert was asked what he would do if he heard age-related jokes at the office place.  After stating that he would meet with the person in his office if it was the first incident, or a "formal written reprimand" if it was a repeat occurrence, Egert was asked if he took "jokes or comments about age" seriously.  Egert responded:

> It really depends on the audience and whether it's, you know, somebody telling a joke about age or with a bunch of young people in the room.  If it's not offending anybody, you know, I wouldn't – certainly wouldn't take

any action. If it was offensive to me or to anybody or if I felt it was offensive to me or anybody else in the room I would probably react.

Plaintiffs contend that Egert's comment are evidence of discrimination. The Court disagrees. Egert's comments do not establish that he, or any other MCI decision maker, improperly considered age in making the decision to include Plaintiffs in the RIF.

Plaintiffs go on to argue that many of their co-workers made age-related jokes in the work place, and that these jokes are evidence of discrimination in the RIF. Specifically, Hunter complains that a co-worker greeted him by saying "hey, old man" and Utley complains about a coworker that joked about his bald spot. Plaintiffs equate these alleged "ageist jokes" with the use of racist language in the work place. Plaintiffs position fails to show that the RIF was conducted in a discriminatory manner. Plaintiffs have adduced no evidence that the comments were made by an individual with authority over the termination or by someone in a position to influence the termination decision. Moreover, Plaintiffs have offered no evidence that any of the jokes were in any way related to their inclusion in the RIF. Consequently, the Court finds that none of the alleged "ageist jokes and statements" are sufficient to raise a genuine issue of material fact.

### VIII. U.S. Field Operations—South/West Texas Operations

John Alvarez, Richard Garcia, Tommy Merrill, Michael Schwarz, and David Valdez worked for MCI in the U.S. Field Operations — South/West Texas Operations.

Alvarez, Garcia, Merrill, Schwarz, and Valdez contend that MCI discriminated against them on the basis of their age in violation of the ADEA.

In late 2003, planning commenced at MCI for the January 2004 RIF. Jeffrey Matthis, Director of Field Operations, South Central Territory, was informed by his supervisor, Thomas McCambridge, that a RIF was coming. Matthis was then given a target by which to reduce headcount within the organization for the January 2004 RIF. Matthis relayed the number to his Senior Managers, including Thomas Jones, so that they could provide him with names of employees to be included in the January 2004 RIF. Jones contacted the Managers working under him, including Mike Kostakis and Herbert Muniz, to ask that they rank employees in their group to be used in deciding who would be included in the RIF. Kostakis and Muniz provided Jones with a ranking of the employees working under them. Based in part on Kostakis' ranking, Tommy Merrill was selected for the January 2004 RIF. Based in part on Muniz's ranking, David Valdez was also selected for the January 2004 RIF.

In late April and early May of 2004, James Dean, Director, U.S. Field Operations—Gulf States Territory, was instructed by his direct supervisor, Thomas McCambridge, Vice-President, to commence planning for an impending RIF. Specifically, McCambridge had been informed of the June 2004 RIF by his supervisor, Paul Bates, Senior Vice President, Network Operations, who gave McCambridge a target percentage by which to reduce headcount in his organization. McCambridge gave his

direct reports, including Dean, a target by which they could reduce overall headcount within their organizations. McCambridge told Dean he was to reduce the overall headcount in his organization by 17 percent, which translated into a targeted reduction of approximately 67 employees within Dean's organization. Dean relayed the information to Jones. Jones consulted with the managers reporting to him, including Kostakis and Muniz, and prepared a list of individuals to be terminated in the June 2004 RIF. John Alvarez, Richard Garcia, and Michael Schwarz were among those Jones included in the June 2004 RIF.

### A. Tommy Merrill

Tommy Merrill originally worked for Claydesta, a company that later merged with MCI, as a Microwave Technician. When Merrill was terminated, he was classified as a Telecom Technician III — a position he had held for approximately two years. Merrill's primary job duties included supporting the "FAA network" and transmission network for a region west of Midland, Texas. Merrill's job duties were focused on performing preventative maintenance on the FAA and transmission equipment. At the time of his termination, Merrill was supervised by Kostakis. Kostakis was responsible for managing employees in the Austin and West Texas area, including Midland, San Angelo, and Lubbock, Texas. Kostakis had supervised Merrill for approximately three years prior to Merrill's termination. As of January 2004, one other employee under Kostakis, John Alvarez, was also based out of Midland, Texas. Tommy Merrill was 62 when he was

terminated.

## 1.)  MCI's Nondiscriminatory Reason

MCI claims that Merrill was included in the January 2004 RIF based on his performance and the business needs of the company.  Specifically, MCI says Merrill was terminated partially based on Kostakis' ranking.  Kostakis says he based his rankings on "his analysis of his employees job responsibilities, and the impact that losing a particular employee would have on how well his group would be able to accomplish the needs of the business."  Kostakis initially ranked Merrill 12th out of 14 employees.  Brian Mesey and Michael Schwarz were both ranked lower than Merrill on Kostakis' original ranking.  Kostakis claims that after he provided his ranking to Jones, he and Jones had a discussion about the future needs of the business.  In that discussion, Kostakis says the two discussed the need to have employees located in a centralized area as opposed to having employees scattered throughout a large geographic area.  As a result of that discussion, Kostakis says he reevaluated his ranking and determined that Merrill was the least valuable employee in his group, based in part, on the fact that he was located in Midland.  Specifically, Kostakis says he made a decision to terminate one of the two employees based in Midland because he felt that the work load for the Midland location could adequately be handled by a single employee.  Kostakis claims that he believed Alvarez was more valuable to the continued operations of the business.  MCI claims that as of the January 2004 RIF, Merrill was considered to be primarily an "outside plant"

employee, and because Jones had been instructed to focus on eliminating outside plant employees where possible, Merrill was selected for RIF. Finally, Kostakis says he considered the fact that MCI had made a business decision "to put less value on preventative maintenance," and that a very high percentage of the work performed by Merrill was preventative maintenance.

### 2.) Merrill's Evidence of Pretext

Because MCI has articulated a specific nondiscriminatory reason why Merrill was included in the RIF, the burden shifts back to Merrill to show that MCI's proffered reason is merely pretext for unlawful age discrimination.

### a.) Merrill's Evidence He Was "Clearly Better Qualified"

Merrill argues that he was "clearly better qualified" than younger technicians. Specifically, Merrill points to a positive performance review from 2002 where Kostakis indicated that Merrill "demonstrates a very technical knowledge of his assigned area" and "pays attention to changing technology, including new software programs." Specifically, Merrill contends that he was "clearly better qualified" than Don Maxey. Maxey, who was 51 years old at the time of the RIF, worked for MCI from a Lubbock, Texas location. Merrill testified that he and Maxey worked on projects together about once every 60 days between 1996 and 2004. Merrill asserts that Maxey had limited knowledge of the fiber equipment system. The only evidence Merrill provides in support

of this assertion is his own deposition testimony that Maxey would call and ask "generalized questions on the system, [showing] that he did not understand it." Merrill's evidence falls far short of supporting an inference that he was "clearly better qualified" than Maxey. Merrill has not offered the type of comparative evidence that would allow the trier of fact to conclude that Merrill's qualifications and abilities were so superior to Maxey's that MCI discriminated against Merrill based on his age by including him in the RIF.

Next, Merrill claims he was "clearly better qualified" than Jim Deaver. Merrill points to the fact that he trained Deaver with fiber repair. In support of this claim, Merrill again cites to his deposition where he asserts that Deaver lacked experience and knowledge. Such self-serving statements, without more, are not sufficient to raise an inference that he was "clearly better qualified" than Deaver.

### b.) Retaining Lower Ranked Employee

Merrill contends that the fact that MCI retained an employee that was ranked lower than he was constitutes evidence of pretext. It is undisputed that Kostakis ranked Brian Mesey, a younger employee, below Merrill, but terminated Merrill nonetheless. Merrill contends that this fact, standing alone, is evidence of pretext. MCI responds by arguing that "other factors," in addition to his ranking, contributed to his termination. Specifically, MCI claims the decision to terminate one of the two engineers in the

Midland office, the fact that Merrill was primarily an "outside plant" employee, and the fact that MCI made a business decision to cut back on "preventative maintenance" all played in to the decision to include Merrill in the RIF. Merrill has provided no evidence that any of these particular reasons for his inclusion in the RIF are pretext. Consequently, the mere fact that a lower ranked employee was not included in the RIF is insufficient to raise a genuine issue of material fact on Merrill's age claim.

### c.) MCI's Reasons Have Changed

Merrill argues that MCI's stated reasons for his termination have changed over time. Merrill claims that when he was terminated on January 26, 2004 Kostakis said he could not tell Merrill why he was being terminated. In its statement to the EEOC, MCI claimed that Jones was instructed to focus on eliminating outside plant positions, and that Jones selected Merrill for the RIF partially because Merrill worked in an outside plant position. Jones direct superior, Matthis, testified that he didn't recall giving Jones such an instruction. Merrill argues that Matthis' deposition testimony is evidence that Jones' stated reason is pretext for unlawful discrimination. The Court disagrees. MCI has consistently asserted that part of the reason Merrill was terminated was because it was eliminating some outside plant employees. Neither Matthis nor anyone else at MCI has taken a different position. The fact that Matthis does not have a specific recollection of telling Jones to focus on eliminating outside plant employees does not controvert Jones statement that he was operating under the assumption that MCI had

such a policy. Even if Jones was mistaken in his belief, that does not support an inference that MCI unlawfully discriminated against Merrill based on his age. *See Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005).

### 3.) Merrill's Other Evidence of Age Discrimination

Merrill also contends that "age-related jokes and statements" establish a fact question as to whether he was terminated based on his age. Merrill says that he slipped off a ladder on one occasion while Kostakis was on a conference call with his direct reports. John Alvarez, another plaintiff in this case, testified that he heard a coworker comment to the effect that Merrill's mind was slipping too. Merrill argues that this evidence supports an inference that he was discriminated based on age. The Court disagrees. There is no evidence that Kostakis heard the comment, let alone that he was influenced by it when he made his decision to terminate Merrill. Moreover, it isn't entirely clear that the comment is even age-related.

Merrill has failed to bring forth evidence raising a genuine issue of material fact on his age discrimination claim. Consequently, the Court concludes that summary judgment is appropriate.

### B. David Valdez

David Valdez began his employment with MCI on October 31, 1994 as a Telecom Technician I. Valdez worked at a location in San Antonio, Texas known as

"San Antonio Junction" under the supervision of Herbert Muniz, Manager. In 2004, Muniz's group was responsible for managing the maintenance of MCI's electronic systems, such as switches and Digital Cross-Connects ("DXCs"), and the installation operations of circuits relating to those systems. As of January 2004, Valdez worked primarily as a Maintenance Technician in Muniz's group. In preparation for the January 2004 RIF, Muniz prepared a ranking of his employees, which he forwarded to his Senior Manager at the time, Mel Kimbrell. In approximately August 2003, Kimbrell left MCI, and Muniz began to report to Jones. At some point prior to the January 2004 RIF, Muniz forwarded to Jones the rankings he had previously prepared for Kimbrell. Valdez was ranked last of Muniz's active employees as of December 2003. Valdez was included in the January 2004 RIF. He was 44 when he was terminated.

### 1.) MCI's Nondiscriminatory Reason for Terminating Valdez

MCI claims that it terminated Valdez based on Muniz's nondiscriminatory ranking of the employees working under him. MCI claims that Muniz ranked Valdez low "because, although [he] was experienced on maintenance of the switches, he was not experienced working with the circuits on the switches." Furthermore, Muniz says that he believed that Valdez did maintenance work well, but believed that his knowledge was lacking on other systems. Jones testified that he determined that he could reduce headcount in San Antonio based on the city's current work load and the type of work the facilities were performing. In particular, Jones says he felt he could eliminate an

employee from Muniz's group because that group focused on the maintenance of switches and installation of circuits interfaced with the switches — a task that was "more and more . . . being performed remotely at centralized locations." Consequently, Valdez was terminated as part of the January 2004 RIF.

### 2.) Valdez's Evidence of Pretext

Because MCI has articulated a specific nondiscriminatory reason why Valdez was included in the RIF, the burden shifts back to Valdez to show that MCI's proffered reason is merely pretext for unlawful age discrimination.

### a.) Valdez's Evidence that He Was "Clearly Better Qualified"

Valdez argues that he was "clearly better qualified" than younger technicians that were not included in the January 2004 RIF. In support of his assertion Valdez cites a positive 2003 performance review by Muniz and notes that he trained a younger employee that was not included in the RIF. Valdez's only comparative evidence is his own deposition testimony where he says that the younger employee's experience was limited. The fact that Valdez had a positive performance review does nothing to demonstrate Valdez's qualifications relative to the younger employee. Additionally, Valdez's self-serving deposition testimony is not the type of comparative evidence needed to allow the trier of fact to conclude that Valdez was "clearly better qualified" than a younger similarly situated employee that was retained.

### b.)  Valdez's Evidence that MCI's Reasons for His Termination Have Changed

Valdez claims that MCI's stated reasons for his termination have changed over time, and that the change is evidence of pretext.  Specifically, Valdez claims that Muniz told him that he had nothing to do with his termination.  Muniz denies making the statement.  Assuming the statement was made, as the Court must at the summary judgment stage of the case, it does not create a fact issue as to pretext.  While it is certainly true that an employer's evolving explanation for an employee's termination will sometimes be sufficient to allow a fact finder to conclude that the employer's proffered reasons are merely pretext for age discrimination, it doesn't necessarily follow that a decision-maker's denial of responsibility for a decision will always support the same inference.  A supervisor tasked with the unenviable duty of informing an employee of his discharge has every incentive to minimize, or deny altogether, his role in the decision to terminate the employee to avoid a potentially volatile situation.  There may very well be some cases in which a supervisor's denial of his role in the decision to terminate the Plaintiff creates a genuine issue of material fact, but this is not such a case.  There is simply no evidence to support the conclusion that Muniz made the alleged statement for the purpose of concealing age discrimination.

Valdez has failed to bring forth evidence raising a genuine issue of material fact on his age discrimination claim.  Consequently, the Court concludes that summary judgment is appropriate.

### C. John Alvarez

John Alvarez began his employment with MCI in 1984 when he was hired as a Switch Manager. At the time of his termination from MCI in 2004, Alvarez reported to Kostakis in Midland, Texas. His job title was Telecom Technician III. Alvarez's responsibilities included, among other things, network maintenance in a region around Midland, taking care of the fiber optics system installations, maintaining emergency equipment and alarms, installing and testing customer premise equipment, among other things.

Prior to the January 2004 RIF, Alvarez worked with Merrill from the Midland location. After Merrill was terminated as part of the January 2004 RIF, Alvarez assumed the majority of Merrill's previous job duties and responsibilities. Alvarez was selected for inclusion in the June 2004 RIF. He was 57 when he was terminated.

#### 1.) MCI's Nondiscriminatory Reason for Terminating Alvarez

MCI claims that Alvarez was terminated based on the business needs of the company. Specifically, MCI says Alvarez was terminated based in part on Kostakis' ranking and in part because of geographical reasons. Alvarez was ranked 8th out of 13 employees working under Kostakis. MCI says that Alvarez was terminated, in spite of the fact that he ranked higher than several employees that weren't terminated, because the company decided to eliminate positions in West Texas. Kostakis says that he met

with Jones prior to the June 2004 RIF. At that meeting, they agreed that growth was likely to occur in the Austin, Texas metropolitan area and unlikely to occur in West Texas. Consequently, Kostakis says he decided to eliminate only one person from the Austin location, Michael Schwarz, and to eliminate both Alvarez and Brian Mesey from West Texas locations.

MCI says that it terminated Alvarez in particular from West Texas based on his ranking and his location in Midland. The only employee in West Texas ranked lower than Alvarez was Jim Deaver, age 46. Deaver was located in San Angelo, Texas and his responsibilities there were similar to Alvarez's responsibilities in Midland. Deaver was the only technician in San Angelo. MCI claims that it was faced with the choice of leaving either Midland or San Angelo without a technician on site. MCI claims that it decided to eliminate the Midland position for three reasons: 1.) San Angelo was more centrally located within Kostakis's region, therefore, response times for Deaver coming from San Angelo would be faster than if San Angelo was left unattended and Alvarez had to travel from Midland to respond to calls, 2.) the facilities that Alvarez maintained on his Midland route were not company owned, and 3.) MCI had a large "FAA presence" in San Angelo, and in terms of the number of FAA circuits, Deaver had considerably more FAA network to maintain than Alvarez.

## 2.)  Alvarez's Evidence of Pretext

Because MCI has articulated a specific nondiscriminatory reason why Alvarez was included in the RIF, the burden shifts back to Alvarez to show that MCI's proffered reason is merely pretext for unlawful age discrimination.

### a.)  Alvarez's Evidence that He Was "Clearly Better Qualified" and that MCI's Reasons Are Unworthy of Credence

Alvarez contends that he was "clearly better qualified" than Deaver, a younger technician that was not terminated as part of the June 2004 RIF.  Additionally, Alvarez contends that MCI's stated reasons are unworthy of credence because Deaver was ranked lower than Alvarez, yet Deaver was not terminated in the June 2004 RIF. Specifically, Alvarez points to his 2003 performance review where Kostakis said "John [Alvarez] has done a great job of providing technical support to all in the area, especially Jim [Deaver] who has very little knowledge of the transmission network."  Additionally, Alvarez says that he trained Deaver in Midland from 2002 to 2003 at Kostakis' behest.

MCI responds by arguing, among other things, that it is inappropriate to compare Alvarez to Deaver because they worked at different locations at the time of the June 2004 RIF.  MCI says that it decided to retain Deaver instead of Alvarez, in large part, because it decided it was important to have a technician operating out of San Angelo. The Court agrees with MCI's position.   Alvarez has brought forth no evidence

challenging the fact that MCI decided to keep an employee in the San Angelo location. Alvarez does say that MCI could have terminated Deaver and then transferred Alvarez to San Angelo. As previously mentioned, it was not MCI's obligation to shuffle employees in order to benefit older workers.

### b.) Alvarez's Evidence that MCI's Reasons for His Termination Have Changed

Next, Alvarez argues that MCI's stated reasons for his termination have changed, and that the change is evidence of pretext. Specifically, Alvarez claims that Kostakis told him that he had nothing to do with the decision to terminate Alvarez and that it "came from above." Subsequently, MCI claimed that Alvarez's termination was influenced by Kostakis' rankings. Construing the evidence in the light most favorable to Alvarez and assuming Kostakis told Alvarez that he had nothing to do with the decision to include Alvarez in the RIF and that it "came from above," the Court concludes that this is insufficient to raise a genuine issue of material fact as to pretext. First, as MCI argues, the decision to terminate Alvarez certainly did come from above in the sense that the decision to conduct an RIF was made by upper management, and that it was Jones that made the ultimate decision to terminate Alvarez. Second, with respect to the comment that Kostakis had nothing to do with the decision, this alleged discrepancy is not sufficient to raise a fact issue. As previously discussed, the mere fact that a supervisor does not tell a terminated employee the extent of his role in the termination is insufficient by itself to establish pretext.

Alvarez has failed to bring forth evidence raising a genuine issue of material fact on his age discrimination claim. Consequently, the Court concludes that summary judgment is appropriate.

### D. Richard Garcia

Richard Garcia began his employment with MCI in February 1982 as a Switch Technician in Dallas, Texas. In 1983, Garcia transferred from Dallas to Forth Worth to run a new switch that had been installed there. In June 1984, Garcia transferred to San Antonio, Texas where he began working as Telecom Technician III. Garcia remained in this position until the time of his termination in June 2004. Garcia, under the supervision of Muniz, was primarily responsible for working on switches, specifically long distance switch. Garcia's responsibilities also included working on "DXCs" and maintenance tickets. In preparation for the June 2004 RIF Muniz prepared a ranking of the employees working under him. Garcia was ranked 9th out of 11 employees. Based on Muniz's ranking, Jones decided to include Garcia in the June 2004 RIF. Garcia was 46 when he was terminated.

### 1.) MCI's Nondiscriminatory Reason for Terminating Garcia

MCI claims that Jones decided he could reduce headcount by two in Muniz's group, and that Garcia was selected as one of the two based on Muniz's ranking. Muniz says he analyzed his employees strengths and weaknesses to determine who was most

valuable to the organization and ranked them accordingly. Muniz says that Garcia was knowledgeable about the domestic long distance switch, but his knowledge and skills were otherwise limited. Additionally, Muniz says that Garcia could not resolve problems as quickly as the other employees ranked above him and that he was slower working maintenance and circuitry on the switch equipment. Furthermore, MCI says that Jones also considered the fact that Garcia was primarily a switch technician—a position that MCI claims had a diminishing workload.

### 2.) Garcia's Evidence of Pretext

Because MCI has articulated a specific nondiscriminatory reason why Garcia was included in the RIF, the burden shifts back to Garcia to show that MCI's proffered reason is merely pretext for unlawful age discrimination.

### a.) Garcia's Evidence He Was "Clearly Better Qualified"

Garcia argues that he was "clearly better qualified" than Joe Garcia and Jorge Lira, younger technicians that were not terminated in the June 2004 RIF. Specifically, Garcia points to the fact that he trained Joe Garcia in 2003 as evidence in support of his position. Garcia also says that co-workers Anel Rios and Ruben Guerrrero agree that he is more qualified than Joe Garcia. In support of this assertion, Garcia points only to his own deposition testimony. MCI argues that his deposition testimony relating to Rios and Guerrrero's statements are hearsay. The Court agrees. Garcia failed to point the

Court to any admissible summary judgment evidence, i.e. an affidavit from Rios or Guerrerro, to corroborate his testimony. Consequently, the only evidence that Garcia has to support his assertion that he is "clearly better qualified" than Joe Garcia is the mere fact that he trained him. Standing alone, this is not enough to allow the trier of fact to conclude that MCI's proffered reason is merely pretext for age discrimination. With respect to Lira, the only summary judgment evidence offered by Garcia is his own belief that he was better qualified. As previously discussed in this opinion, such evidence is insufficient to raise a genuine issue of material fact.

### b.) Garcia's Evidence that MCI's Reasons Are Unworthy of Credence

Garcia argues that MCI's proffered reason for his termination is simply unworthy of credence. In support of his assertion Garcia points to a positive performance review from 2003 and claims that his "skills and abilities were not just limited to switch work." The Court finds this position unpersuasive. MCI has never taken the position that Garcia was a bad employee or a poor performer overall. In the context of an RIF, good employees are sometimes terminated as a business necessity. Making general references to his skills and abilities without establishing that he was "clearly better qualified" than a younger employee that was not terminated is insufficient to raise a genuine issue of material fact.

### c.) Garcia's Evidence that MCI's Reasons for His Termination Have Changed

Garcia claims that MCI's reasons for his termination have changed and that the change is evidence of pretext. Specifically, Garcia claims that at the time of his termination Muniz told him that the decision came from above him in the company, and that he had no control over the decision. Later, MCI claimed that Garcia was terminated in large part because of Muniz's ranking of Garcia. As previously discussed in this opinion, this type of alleged discrepancy is not sufficient to allow the trier of fact to conclude that MCI's proffered reason is merely pretext for age discrimination.

Garcia also claims that the position taken by MCI in its letter to the EEOC is inconsistent with the position that it now takes before the Court. In its letter to the EEOC, MCI said "all switch responsibilities were centralized" and Garcia's work was "done remotely." Garcia claims, and MCI concedes, that the switch responsibilities were never actually centralized. Garcia argues that this supports an inference that MCI's proffered reason is pretext for age discrimination. MCI responds by pointing to Jones' affidavit where he says he believed the overall job responsibilities for switch technicians were decreasing. MCI contends that even if the centralization never actually took place, Jones' belief is nonetheless a nondiscriminatory reason for terminating Garcia. The Court agrees. While it is certainly true that a material change in the reason for an employee's termination may support an inference of pretext, a slight inconsistency will not always support the same inference. If there is any inconsistency at all, it is

insufficient to allow a trier of fact to conclude that MCI's proffered reason is false.

Garcia has failed to bring forth evidence raising a genuine issue of material fact on his age discrimination claim. Consequently, the Court concludes that summary judgment is appropriate.

### E. Michael Schwarz

Michael Schwarz began his employment with an MCI predecessor in October 1986. In 1991, Schwarz became an MCI manager in Austin, Texas. Schwarz managed the MCI "DEX-400 tandem switch site" in Austin for approximately one year. Schwarz continued to work at this switch site as a Telecom Technician IV from 1992 until MCI decommissioned the site in approximately 1998. Subsequently, Schwarz started doing local switch work for MCI. He was in charge of maintaining the switch, the transport gear, completing inventory of all "spares," maintaining the air conditioning system, and a variety of other activities in the switch room. In 1998, MCI reclassified job titles and Schwarz became a Telecom Technician III. From 1998 through 2004 Schwarz continued with similar job titles and duties until his termination in the June 2004 RIF. Schwarz was 46 when he was terminated.

### 1.) MCI's Nondiscriminatory Reason

MCI claims that it terminated Schwarz based on his performance and the business needs of the company. In December 2003, Kostakis provided a ranking list to his Senior

Manager, Jones, in anticipation of the January 2004 RIF. In Kostakis' December 2003 rankings, Kostakis ranked Schwarz as the least valuable employee of the 14 working under him. MCI says that Kostakis was spared from the January 2004 RIF because of the decision to eliminate Tommy Merrill from the Midland location. In preparation for the June 2004 RIF, Kostakis again ranked the employees working under him. This time Schwarz was ranked 12th out of 13 employees. Brian Mesey, the only employee ranked lower than Schwarz, was also terminated in the June 2004 RIF. Kostakis says he based his ranking on the business needs of the organization and the geographical location of employees. Specifically, he says he believed he could eliminate one position from the Austin location in the June 2004 RIF. Kostakis says Schwarz was the best candidate for the RIF out of the employees in the Austin location. Kostakis says be believed Schwarz lacked initiative to learn all aspects of his group's operation, thus making him less valuable than other employees that had branched out to learn different skills.

### 2.) Schwarz's Evidence of Pretext

Because MCI has articulated a specific nondiscriminatory reason why Schwarz was included in the RIF, the burden shifts back to Schwarz to show that MCI's proffered reason is merely pretext for unlawful age discrimination.

### a.) Schwarz's Evidence He Was "Clearly Better Qualified"

Schwarz claims that he was "clearly better qualified" than younger employees that were not terminated as part of the June 2004 RIF.  Specifically, Schwarz says he was "clearly better qualified" than Randy Rodriguez, age 28, and David Nunez, age 41.  Schwarz points to his deposition testimony as the only evidence in support of his assertion.  Schwarz testified that he believed Rodriguez's experience was limited, that he had to help Rodriguez on a some tasks, and that he frequently got calls from Nunez asking for help with his job.  As already discussed in this opinion, Schwarz's personal belief that he was "clearly better qualified" than younger employees is not sufficient to raise a genuine issue of material fact.

### b.)  MCI's Reasons Have Changed

Schwarz argues that MCI's reasons for his termination have changed over time.  Schwarz says that he asked Kostakis who made the decision to terminate him and Kostakis told him that he did not know.  Subsequently, Schwarz says he learned that not only did Kostakis know who made the decision to terminate him, but that Kostakis himself played a major role in the decision.  This alleged inconsistency, however, is insufficient to raise a genuine issue of material fact.  First, Schwarz has brought forth no evidence that Kostakis in fact knew who the ultimate decision-maker was.  Additionally, even assuming Kostakis did know the extent of the decision-making process, such a

minor inconsistency in this context could not allow the trier of fact to determine that MCI discriminated against Schwarz on the basis of his age.

### 3.) Direct Evidence of Age Discrimination

Schwarz claims that Rodriguez and Nunez, his coworkers, made "a lot of statements" about him balding. Schwarz claims that "When they stood outside and [he] would take his hat off, they would put their hands up and pretend to block the so-called glare from [his] head." He also claims they made a comment about "grandpa having to go to bed early at night." Schwarz fails, however, to provide any evidence connecting these comments to the ultimate decision to terminate him. There is no evidence that either Rodriguez or Nunez had any influence over Kostakis' ranking or Jones decision to include Schwarz in the RIF.

Schwarz also claims that on one particular occasion when Schwarz and his coworkers were offloading equipment from a truck into a warehouse, Kostakis made an ageist remark. After moving the equipment, Schwarz was sweating and looked flush. Kostakis allegedly told him, "you better sit down . . . you are not looking so good . . . you know, the older you get, the less physical you can get." Schwarz claims that these statements are evidence that Kostakis unlawfully discriminated against him based on age. The Court disagrees. Kostakis' alleged comment, which is isolated at best, does not show that he had animosity toward Schwarz based on his age, nor does it show that

Schwarz's age was factored into the ranking.

Schwarz has failed to bring forth evidence raising a genuine issue of material fact on his age discrimination claim. Consequently, the Court concludes that summary judgment is appropriate.

## IX. Common Arguments Advanced by All Plaintiffs in All Groups

In their briefing to the Court, Plaintiffs argue that MCI selectively enforced its "stack rankings," and that this is evidence of age discrimination. Additionally, Plaintiffs, argue that MCI has not sufficiently articulated its nondiscriminatory reasons as to each Plaintiff. Both of these arguments are applicable to all Plaintiffs in all groups. After consideration, the Court concludes that Plaintiffs are still incapable of raising a fact issue on their age discrimination claims.

### A. Selective Enforcement of Stack Rankings

Plaintiffs argue that MCI selectively enforced its stack rankings, and that this is evidence of age discrimination. It is true that MCI did not always terminate the lowest ranked employee. However, that fact alone does not support an inference of age discrimination. MCI has articulated specific reasons why it deviated from its rankings when it chose to do so. Plaintiffs have failed to make a showing that MCI's deviation from its rankings was pretext for age discrimination.

## B.  Specificity of Nondiscriminatory Reason

Plaintiffs argue that a recent Fifth Circuit case,  *Alvarado v. Texas Rangers et al.* 2007 WL 2028917 (5th Cir. July 16, 2007), supports their argument that MCI has failed to adequately specify the nondiscriminatory reason for their termination.  In that case, the plaintiff's employer ranked plaintiff based on a subjectively scored interview. The employer in *Alvarado* did not specify why the plaintiff received a low score for the interview.  The Fifth Circuit held that the employer had failed to carry its burden of providing a sufficiently detailed nondiscriminatory reason for the plaintiff's termination and reversed the trial court's summary judgment.  The facts of the case at bar, however, are distinguishable.  While it is true that MCI could not have simply cited the RIF or its rankings as its nondiscriminatory reason for terminating Plaintiffs, MCI has gone much farther in this case.  With respect to each plaintiff, MCI has provided a sufficiently detailed explanation as to why each individual plaintiff received the ranking that he or she did, and ultimately how that factored into the termination.

## X.  Summary Judgment on Retaliation Claims

The ADEA makes it unlawful for an employer to "discriminate against . . . applicants for employment . . . because [any] such individual . . . has made a charge under this chapter."  29 U.S.C. § 623(d).  In order to establish a prima facie case of retaliation a plaintiff must show that: (1) he engaged in protected activity, (2) a

materially adverse action occurred, and (3) a causal link existed between the protected activity and the adverse action. *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002); *Peace v. Harvey*, 207 Fed. Appx. 366, 368 (5th Cir. 2006); *Burlington Northern & Sante Fe Ry. Co. v. White*, 126 S.Ct. 2405 (2006)(holding that the materially adverse action need not be related to the plaintiffs employment). After a plaintiff establishes a prima facie case of retaliation, the burden then shifts to the defendant to demonstrate a legitimate, nonretaliatory purpose for the action. *Gee*, 289 F.3d at 345. If the defendant articulates a nonretaliatory reason, the plaintiff must then bring forth evidence that the employer's stated reasons is merely pretext for unlawful retaliation. *Id.*

### A. Factual Background

Plaintiffs Alvarez, Boyd, Garcia, Gove, Guerra, Lyons, McIver, Montocolmbi, Preissler, Schimek, Schwarz, Smith, Utley, Valdez, and Vonschmittou (hereinafter "Plaintiffs") each claim that MCI retaliated against them for filing complaints with the EEOC. By its order of January 22, 2008 this Court denied MCI's Motion for Summary Judgment on Valdez's retaliation claim. After considering the summary judgment evidence, the Court concludes that summary judgment is appropriate on the remainder of the retaliation claims in this case.

Following their terminations from MCI, Plaintiffs sent letters to Norma Jaminet in the MCI Human Resources office asking to be considered for any open positions.

Jaminet replied to the letters and told Plaintiffs that their correspondence was not the proper way to apply for positions with MCI. Jaminet identified some appropriate vehicles to seek employment with the company: MCI's online Career Center, other internet job sites, and classified advertisements in newspapers. Plaintiffs claim that MCI's refusal to consider them for rehire is evidence that MCI retaliated against them based on the fact that they filed a complaint against MCI with the EEOC.

In their briefing to the Court, Plaintiffs' primarily address their retaliation claims as a group, with two exceptions — Gove's retaliation claim and Preissler's retaliation claim. Consequently, the Court will follow the same format. First, the Court will address the general arguments advanced by all Plaintiffs relating to their retaliation claims. Second, the Court will address the specific arguments that relate to Gove's retaliation claim and Preissler's retaliation claim.

The Court assumes, without deciding, that Plaintiffs are each able to establish a prima facie case of retaliation. Consequently, the Court will initially look to MCI's nonretaliatory reason for not rehiring Plaintiffs.

### B.  MCI's Nonretaliatory Reason for not Rehiring

MCI claims that it was its policy and practice at the time of Plaintiffs requests to disregard any unsolicited resumes sent to its human resources department. Specifically, MCI claims the policy was in place because at that time MCI was receiving a large

number of resumes not tied to specific job openings, and without a recruiting function in the human resources department, they could not process all of the requests. Furthermore, due to the financial condition of the company in 2004, MCI was reducing staff, and job openings with the company were limited. Having articulated a nonretaliatory reason for not rehiring Plaintiffs, the burden shifts to Plaintiffs to bring forth evidence that MCI's stated reason is merely pretext for unlawful retaliation.

## C. Plaintiffs' Evidence of Pretext

Plaintiffs make a variety of arguments in an attempt to raise a genuine issue of material fact on their retaliation claims. Plaintiffs arguments largely fall into one of three categories. First, Plaintiffs argue that the fact that MCI's policy of discarding unsolicited resumes was not in writing is evidence that it is merely pretext for unlawful retaliation. Second, Plaintiffs contend that the fact that many MCI supervisors were unaware of the policy is evidence of pretext. Finally, Plaintiffs argue that MCI acted inconsistently with the purported policy and that its actions are evidence of pretext.

## 1.) MCI's Policy Was not in Writing

Plaintiffs point to the fact that MCI's policy against considering unsolicited resumes was not in writing as evidence of retaliation. Specifically, Plaintiffs point out that the policy is not included in MCI's policy handbook. The Court does not find this argument persuasive. The mere fact that a corporation has not reduced a policy or

practice to writing, without more, is not evidence that the policy or practice is pretext for unlawful retaliation. To hold otherwise would require employers to endlessly detail in writing every custom, practice, and procedure at the company. The ADEA does not mandate such a burdensome practice.

### 2.) Supervisors Were Unaware of the Policy

Next, Plaintiffs point to deposition testimony where certain MCI supervisors indicate that they were unaware of the human resources policy on unsolicited resumes. Again, the Court does not find that this demonstrates unlawful retaliation. The fact that some supervisors were unaware of the internal policies of the MCI Human Resources Department does nothing to establish that those policies were in fact pretext for unlawful retaliation. In a company with as many supervisors throughout the organization as MCI, it is not surprising that some supervisors were unaware of the policy.

### 3.) Inconsistent Actions

Plaintiffs argue that MCI took a variety of actions inconsistent with its policy against considering unsolicited resumes, and that these actions are evidence of pretext. First, Plaintiffs claim that "MCI actually sought out resume materials that were not only not linked to a particular job opening, but that were provided by individuals who had not even contacted MCI about employment." To support their assertion, Plaintiffs point

to deposition testimony of an MCI corporate representative, Tracey Fitzgerald, where she discusses certain online resources, such as Monster.com, that were available for MCI recruiters looking to fill specific positions. The testimony is consistent with MCI's proffered nonretaliatory reason for not considering Plaintiffs' resumes. In fact, Plaintiffs citation to the Fitzgerald's deposition testimony only bolsters MCI's position. By utilizing the online resources that matched job-seekers with specific open positions, MCI could avoid the burden of processing unsolicited resumes that were not linked to any specific job opening.

The Court finds that Plaintiffs are unable to carry their burden to raise a genuine issue of material fact on the question of pretext. Plaintiffs have not brought forth any evidence that would allow a reasonable juror to conclude that MCI's proffered reason is merely pretext for unlawful retaliation. Specifically, as MCI notes, Plaintiffs have failed to point to any other person that submitted a similar request for employment to MCI that was treated differently than Plaintiffs. Accordingly, the Court finds that summary judgment is appropriate on Plaintiffs' retaliation claims.

As previously mentioned, Plaintiffs Gove and Preissler submitted specific summary judgment evidence in support of their retaliation claims beyond the general evidence submitted by all of the retaliation plaintiffs. Consequently, the Court considers whether that evidence is sufficient to raise a genuine issue of material fact on either of their retaliation claims.

### D.  Walter Gove's Retaliation Claim

Gove claims he was retaliated against by MCI when it refused to rehire him for a specific position for which he applied.  On July 27, 2005 MCI posted an open position for a Senior Technician I in Richardson, Texas.  In response to the post, Gove emailed his former manager, Abbie Edwards, on August 4, 2005.  Subsequently, Edwards responded by telling Gove that there was no longer an open position.  Gove claims that MCI's failure to hire him for the position was retaliation for filing an EEOC complaint.

### 1.)  MCI's Nonretaliatory Reason for not Rehiring Gove

MCI claims that "the position [Gove applied for] was no longer available when Gove sent his email."  Consequently, MCI says it could not possibly have retaliated against Gove.  MCI says that Margaret Andersen had already been selected to fill the position identified by Gove in his email.

### 2.) Gove's Evidence of Pretext

Because MCI has specified a nonretaliatory reason for not rehiring Gove, the burden shifts back to Gove to raise a genuine issue of material fact on his retaliation claim.

### a.)  Gove's Evidence that MCI's Reason Is False

Gove attempts to establish that MCI's stated reason for its failure to rehire him is simply false.  Gove claims the position for which he applied was open when Edwards told him it had been filled.  Gove argues that the position could not possibly have been filled by August 4, 2005, the date on which he contacted Edwards.  In support of his assertion, Gove points to a document referenced only as an "EPSR."  While it is unclear what "EPSR" stands for, the document appears to be a form used by MCI to record the promotion of Margaret Anderson to the Senior Trainer position.  Under the heading "Approval Routing List" the document says "<u>Abbie Edwards</u> Initiated on August 04, 2005."  Gove claims that the EPSR is "the first step in the hiring process."  It follows, Gove contends, that the position could not have been filled at the time he contacted Edwards.  MCI responds by arguing that the EPSR is not the first step in the hiring process, but rather that the August 4, 2005 date on the form reflects the fact that "the proposal to hire [Anderson] was approved on August 4."  Notably, neither Gove nor MCI point to any summary judgment evidence to clarify the purpose and meaning of the EPSR.  Regardless, Gove is unable to provide sufficient evidence showing the falsity of Edward's alleged response.

Gove is unable to demonstrate the falsity of Edwards response because he has provided no evidence that Edwards sent her response before the position was actually filled.  In his affidavit, Gove states "I contacted Abbie Edwards by e-mail on August 4,

2005 and attached my resume to the e-mail.  Ms. Edwards responded by e-mail and stated that the position there was no position open [sic]."  Edwards testified that she does not recall responding to Gove's email.  Gove has brought forth no evidence regarding the timing of Edward's allegedly false response.  It is undisputed that the position was eventually filled by Andersen.  If the position was filled prior to Andersen responding to Gove's email, then Gove's claim that Andersen indicated that the position was not open would be entirely consistent with MCI's proffered reason.  Because Gove will carry the burden of proof on his claim at trial, it is his burden to bring forth summary judgment evidence sufficient to allow the trier of fact to find in his favor.  By failing to bring forth any evidence with respect to the timing of the alleged response, Gove has failed to raise a fact issue.

### b.)  MCI's Reasons Have Changed

Gove also argues that MCI's stated reason for its failure to rehire him has changed over time.  Gove contends that Edwards original proffered reason — that there was no open position — differs from the reasons MCI states to the Court — a failure to timely apply and a failure to formally apply.  MCI responds by arguing that the explanations are not inconsistent.  The Court agrees.  When MCI says that Gove did not "timely apply," that is simply another way of saying the position was already filled by the time Gove applied.  Additionally, MCI's position that Gove should have formally submitted an application instead of simply sending an email is an alternative, but not inconsistent,

reason for not hiring Gove. Consequently, Gove is unable to raise a fact issue on his retaliation claim and summary judgment is appropriate.

### D. Alfred Preissler Retaliation Claim

Alfred Preissler claims he was retaliated against when Al Maggart, his supervisor, failed to consider him for an open position and hired Sparlin, a former coworker, instead. After Pressler sent a letter to MCI asking to be considered for any open position, MCI decided to add an engineer position in Preissler's former group — COE West. Maggart testified that he did not consider Preissler for the position because he thought Preissler was ineligible because Maggart believed that Preissler had refused to sign a severance agreement when he was terminated. Preissler claims the refusal to rehire him was unlawful retaliation.

### 1.) MCI's Nonretaliatory Reason for not Rehiring Preissler

MCI claims that Preissler was not considered for the open position because of Maggart's mistaken belief that he was ineligible. It is undisputed that Maggart's belief was incorrect in at least two ways. First, Preissler had in fact signed the severance agreement contrary to Maggart's belief. Second, MCI says that Preissler would have been eligible for rehire, even if he had not signed the severance agreement. Notably, the severance agreement provided "this Agreement does not include a release of claims under the Age Discrimination in Employment Act."

## 2.) Preissler's Evidence of Pretext

Preissler argues that the fact that MCI admits that Maggart's belief was incorrect is sufficient to raise a fact issue. MCI responds by arguing that even though Maggart's belief was incorrect, that alone does not raise a fact issue. The Court agrees. It is well settled that an employer's belief in terminating an employee need not be correct, so long as it is reasonable, not arbitrary, and not likely a pretext for unlawful discrimination. *Bauer v. Albemarle Corp.*, 169 F.3d 962, 967 (5th Cir. 1999). Preissler has brought forth no evidence that would suggest that Maggart's mistaken belief is actually pretext for unlawful retaliation.

## XI. Conclusion

It is undisputed that MCI made a business decision to conduct a series of RIFs throughout 2004. Given the fact that a company is often forced to terminate good employees in the context of an RIF, it is more difficult for a plaintiff to show the existence of a genuine issue of material fact by pointing to their qualifications, experience and abilities. *See EEOC v. Texas Instruments, Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996). Many Plaintiffs in this case would not have been terminated but for the fact that MCI decided that an RIF was a business necessity.

Based on the summary judgment evidence presented in this case, the Court concludes that Plaintiffs have failed to raise a genuine issue of material fact on any of

their age discrimination claims, except where MCI's motion for summary judgment has already been denied. Similarly, Plaintiffs asserting retaliation claims are unable to raise a genuine issue of material fact, except where MCI's motion for summary judgment has already been denied. Consequently, the Court concludes that summary judgment is appropriate on the remainder of claims in this case. The Court will issue a final judgment disposing of all claims and all parties after a trial on the merits of Plaintiffs claims that survived MCI's motion for summary judgment. (*See* Doc. No. 312).

**SO ORDERED.**

Signed March 24th, 2008.

_____
ED KINKEADE
UNITED STATES DISTRICT JUDGE